Filed 4/10/19 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re CADEN C., A Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CHRISTINE C. et al.,<br><br>        Defendants and Respondents;<br><br>CADEN C., a Minor,<br><br>        Appellant. | A153925, A154042<br><br>(San Francisco County<br>Super. Ct. No. JD15-3034)<br><br>ORDER MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the published opinion filed herein on April 9, 2019, be modified as follows:

The caption is modified to reflect that the opinion originated in the First Appellate District, Division One, instead of Division Four.

This modification does not change the judgment.


Dated: _____                    _____

                                            SANCHEZ, J.  Acting P.J.

Filed 4/9/19 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re CADEN C., A Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CHRISTINE C. et al., <br><br> Defendants and Respondents; <br><br> CADEN C., a Minor, <br><br> Appellant. | A153925, A154042 <br><br> (San Francisco County Super. Ct. No. JD15-3034) |

We are familiar with this dependency proceeding, having previously reviewed and upheld several prior court orders in the matter, including the juvenile court's decision to set a permanency planning hearing pursuant to section 366.26 of the Welfare and Institutions Code[1] for then seven-year-old Caden C.  (*C.C. v. Superior Court* (Aug. 28, 2017, A151400 [nonpub. opn.].)  At the permanency planning hearing in early 2018, the juvenile court determined that Christine C. (mother) had established a beneficial relationship with Caden under section 366.26, subdivision (c)(1)(B)(i), sufficient to justify a permanent plan of long-term foster care rather than the statutorily preferred plan of adoption.  Both Caden and the San Francisco Human Services Agency (Agency) appeal the court's application of the beneficial relationship exception and decision to forgo termination of parental rights.  Having consolidated and considered the two

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

appeals, we conclude the juvenile court's reliance on the beneficial relationship exception in this case was an abuse of discretion under the applicable legal standard. We therefore reverse.

## I. BACKGROUND

### A. *Mother's Prior Child Welfare History*

Mother's involvement with the child welfare system began in 1986 when her first child, M.C., was detained at birth after both mother and child tested positive for marijuana and cocaine. In August 1989, M.C. was again detained, this time with his younger brother B.P.C. (born in 1987). The same pattern continued for 30 years: each of mother's six children would be removed from her care—sometimes several times—and declared a juvenile court dependent based on recurring concerns about mother's chronic substance abuse, inability to care for her children, and domestic violence in the household. Mother would often enter residential drug treatment and stabilize temporarily, only to relapse again.

During this timeframe, sole custody of mother's third child, T.A. (born in 1995), was granted to the noncustodial, nonoffending parent. Mother's fourth child, B.C. (born in 2000), was removed and placed in the home of her paternal grandmother, who adopted her. Mother's fifth child, N.C.-G. (born in 2002) was removed as a toddler from mother's care and placed in legal guardianship with her paternal grandmother. Mother was convicted of felony drug offenses in 1991 and 2004. After conviction for a third felony drug offense in September 2006, mother was sentenced to three years in prison. It was into this significant history of dysfunction that Caden, the minor involved in these proceedings, was born in 2009.

### B. *Caden's Initial Removal from Mother*

Prior to his initial detention in September 2013, Marin County Health and Human Services (Marin CPS) was well aware of Caden's situation, having received 11 referrals expressing concern for the minor's well-being in mother's custody. When Caden was a toddler, Marin CPS received reports that mother was actively smoking methamphetamine, including in a closed room with the minor present. Mother was seen

getting angry and "taking it out" on the minor by pushing and throwing him in his crib. As a result of these referrals, mother signed a contract with Marin CPS, agreeing to obtain a sponsor, attend a baseline number of 12-step (AA/NA) meetings, and participate in random drug testing. Mother was offered voluntary services but declined them. The contract did not take. In May 2012, mother reportedly stated she had been smoking methamphetamine on a daily basis for two years. A drug task force searched mother's home in Fall 2012, with Caden present, and found a methamphetamine pipe in mother's purse. Other referrals in 2012 expressed concern about mother's drug use in Caden's presence and plan to sleep outdoors with Caden. Although Marin CPS offered funding for several nights' shelter and arranged for mother to enter a treatment program, mother declined these resources.

Caden was taken into protective custody on September 11, 2013—at the age of four years three months. Mother and Caden were ineligible for transitional housing due to mother's lack of employment and positive drug test for PCP in February. Mother's "behavior and language was increasing in frequency and intensity"—she was observed screaming at Caden and was reported to have stated: " 'I want to get rid of Caden so I can get high on Oxycodon.' " Caden was not bathing and did not appear to be eating regularly. He was not enrolled in Head Start and only sporadically attended his speech therapy.

Mother defended her drug use, commenting that she does better on methamphetamine than without it. Mother admitted she was an addict but asserted she nevertheless took good care of her son. She stated she did not need a treatment program and did not understand why Caden had been removed from her. Although diagnosed with posttraumatic stress disorder (PTSD) and depression, mother was not taking medication or following through with mental health referrals. Caden was present when mother expressed extreme frustration, feelings of hopelessness, and suicidal thoughts. According to the social worker, mother was "relying on Caden for emotional support rather than focusing on his needs." In September 2013, Marin CPS filed a dependency petition with respect to Caden, stating the minor was at risk of harm due to mother's

entrenched substance abuse, mental health issues, and prior child welfare history with her other children.[2]

Agency reports revealed the traumatic impact of mother's lifestyle on Caden. M.G. reported mother would scream at Caden and get physical with him. He stated that, although Caden loved mother, he seemed " 'very confused' " by all of the instability he witnessed. Father described the circumstances underlying his domestic violence conviction as follows: " '[Mother] was smoking meth, and dealing drugs, and put her hands on Caden too many times, so I put my hands on her once.' " Mother's case manager at a shelter program where she and Caden had recently stayed related that mother would yell at the minor and placed " 'a lot of her problems onto him.' "

Prior to his removal, mother and Caden had sporadically attended parent-child therapy but were dropped after repeatedly failing to appear when scheduled. Caden was diagnosed with disruptive behavior disorder and PTSD, with symptoms of aggression, impairment of social relationships, tantrums, regressions, and emotional dysregulation. In the social worker's view, mother's untreated drug addiction and mental health issues exposed Caden "to chronic trauma, instability, and dangerous situations including domestic violence, his parents' alcohol and poly-substance abuse, and most recently, homelessness" after mother failed to take advantage of numerous community-based services. In November 2013, both mother and father submitted on an amended petition, and the juvenile court found that Caden was a child described by subdivision (b) of section 300.

At the dispositional hearing on January 14, 2014, the juvenile court declared Caden to be a juvenile court dependent, formally removed him from mother's custody,

---

[2] The jurisdictional report also raised concerns about domestic violence. Caden reported viewing a domestic violence incident involving his mother and her ex-husband M.G. In addition, Caden's biological father, Brian C. (father), was arrested for domestic violence in September 2011 while living with mother and Caden. Father was incarcerated for part of the minor's dependency proceedings, and his whereabouts were unknown after his release. He resurfaced prior to the permanency planning hearing and has filed a respondent's brief in this matter, supporting mother's position.

and ordered visitation and reunification services for mother. Mother had reentered drug treatment in December 2013 and engaged with the program in earnest. In March 2014, mother filed a modification request pursuant to section 388, seeking C.C's return to her care while she remained in treatment. The social worker opposed the modification, noting that mother's recent period of sobriety was commendable but relatively short "in the context of her extremely lengthy substance abuse history." Specifically, mother had previously completed three detoxification programs and six stints in residential treatment, but continued to relapse on methamphetamine. The juvenile court denied mother's modification petition in April as premature.

By the six-month review in July 2014, however, the social worker commended mother for her sustained progress in treatment. Mother had demonstrated a willingness to change her behavior and a desire to live a life free from alcohol and other drugs. She was actively working to contain her anger in stressful situations. She acknowledged that Caden's emotional and physical well-being had been placed at significant risk by her drug addiction and untreated mental health issues. Although Caden reported he missed his mother and wanted to return home, he had been doing well since moving in February to the foster home of C.H. (Ms. H.). Caden's therapist indicated he had "made remarkable progress since stabilizing in the second foster home placement," and the social worker acknowledged Ms. H.'s "dedication to stabilizing Caden's mental, physical, and emotional health." Ms. H. proactively sought out developmental and educational services for Caden and facilitated visitation not only with mother, but also with Caden's stepfather.

Given mother's progress, Caden was returned to her in July 2014 in her residential program and family maintenance services were ordered. The next six-month review was also positive. Mother had remained sober and was actively exploring housing options. Caden had stabilized emotionally but was developmentally delayed and performing below grade level. The case was transferred to San Francisco County and a six-month review held in July 2015, at which family maintenance services were again continued.

Mother had by then completed 14 months of residential treatment and obtained permanent supportive housing.

## C. Caden's Second Removal from Mother

Unfortunately, as the Agency's next family maintenance review report reflected, mother suffered a setback. (See *C.C. v. Superior Court*, *supra*, A151400.) After briefly engaging in NA meetings, mother stopped attending. She tested positive for methamphetamine in June 2015, returned a dilute test in each of July, October, and November 2015, and missed 13 tests. Mother struggled to control her emotions and reportedly threatened to physically harm Caden's teacher. For his part, Caden was experiencing outbursts in his classroom, throwing objects, threatening others, and threatening self-harm. At the review hearing in January 2016, the juvenile court ordered mother to engage in intensive outpatient treatment and continued family maintenance services.

Caden was detained a second time on June 9, 2016, because "mother did not engage in the substance abuse treatment and mental health services ordered by the court in January, had disclosed she relapsed using methamphetamine and tested positive for methamphetamine six times in March through May of 2016, and had missed 18 tests, which were counted as positives." (*C.C. v. Superior Court*, *supra*, A151400.) Further, "[t]he social worker described Caden's relationship with mother as 'toxic.' Mother had made statements to him 'about his removal due to his behaviors or her substance abuse.' . . . [M]other 'has created an unhealthy relationship with the child. The child is unable to separate from [her] due to a high level of concern about her well-being. . . . The Agency has addressed the mother about placing her responsibility on the child, but she continues to have poor boundaries and communication with the child. The child is exposed to conversations that cause fear and create behaviors that jeopardize his safety, emotional well-being, and education.' " (*C.C. v. Superior Court*, *supra*, A151400.) Indeed, after a "moment of stability" in the 2014-2015 school year, Caden now appeared "exhausted, worried, and anxious" in school. He stated he wanted to kill himself because he had been

removed from his mother and "his mother was his spirit." Caden was placed back in the care of Ms. H. and was reported to be adjusting well.

In June 2016, the Agency filed a supplemental petition indicating that the previous disposition had been ineffective in the protection of the minor due to mother's continuing substance abuse and mental health concerns. Because mother had already received family reunification and family maintenance services for over 28 months, the Agency recommended that services be terminated and that a hearing be set pursuant to section 366.26 to select a permanent out-of-home placement for Caden. Mother, who had returned to residential treatment on June 30, 2016, disputed the Agency's recommendation and a contested hearing was set for September.

While this hearing was pending, Caden was moved to another foster placement after Ms. H. gave a seven-day notice seeking his removal. According to the social worker, the minor's placement with Ms. H. "was disrupted because . . . the mother's poor boundaries and impulsive behaviors were emotional[ly] exhausting for the caregiver." Shortly after Caden's placement in a new foster home, the parties stipulated to a settlement of their disputes. Mother agreed to submit on the reports previously filed in connection with the supplemental petition and the Agency supported the minor's placement in long-term foster care for a six-month period designed to give mother time to file a modification petition pursuant to section 388. The parties further agreed mother's twice-weekly supervised visitation would continue but mother would not contact Caden or the caregiver by phone or text unless authorized by the social worker. Based on this stipulation—which the juvenile court signed as an order—the court, in August 2016, found the allegations in the supplemental petition true, terminated reunification services, formally removed Caden from mother for a second time, and placed the minor in long-term foster care. Mother was ordered to file any modification petition by January 2017.

D.   *Mother's Modification Petition Is Denied*

In January 2017, mother filed the contemplated modification petition, seeking either return of Caden or the reinstitution of reunification services. In an attached declaration, she detailed her current efforts at treatment, including completion of a 60-day

residential program, AA/NA meetings, participation in Family Treatment Court, outpatient treatment, and medication management. The Agency filed reports in January indicating that mother's twice weekly visits were regularly attended and were generally positive.

Neither maternal nor paternal family was interested in placement due to their strained relationship with mother and father. While the current foster family had expressed an interest in providing Caden with permanency, issues had "arisen about the child's relationship with the caregiver being sabotaged by the mother." Caden was moved to a third foster home in mid-February 2017. "He had transitioned well and appeared to like his new caregivers, reportedly asking his foster mother to adopt him if he did not return home to his mother. For her part, foster mother indicated she was interested in adopting the minor." (*C.C. v. Superior Court*, *supra*, A151400.)

Mother continued to struggle with her sobriety. She had tested positive for methamphetamine on September 2, 2016, only three days after successfully graduating from her latest residential program. Even as her modification request was pending, "[t]he social worker reported that mother's attendance at her substance abuse outpatient program had been spotty in March. She had tested positive for methamphetamine on February 24 (she denied usage), missed six drug tests between January 20 and March 13, and tested negative for drugs eight times between January 10 and March 9, 2017." (*C.C. v. Superior Court*, *supra*, A151400.)

The juvenile court denied mother's modification petition on April 4, 2017. On May 5, 2017, the court also denied mother's request to have another contest at the upcoming six-month review hearing on the issue of the minor's return and/or further attempts at reunification. The court continued the hearing to May 24, 2017, for a contest on any remaining issues.[3] In advance of this contested May hearing, the Agency filed a

---

[3] Mother appealed the juvenile court's April 2017 denial of her modification petition (*San Francisco Human Services Agency v. C.C.* (A151020), dism. Aug. 30, 2017) and the court's May 2017 decision to limit the contested issues at the minor's six-month permanency review (*San Francisco Human Services Agency v. C.C.*

report recommending that the juvenile court set a hearing pursuant to section 366.26, modifying Caden's permanent plan from long-term foster care to guardianship or adoption.

Mother's situation, unfortunately, continued to decline. She had last attended her outpatient program in March 2017 and had been discharged from Family Treatment Court due to her disengagement from treatment. Mother's visitation was also causing disruption and anxiety for Caden. She needed frequent redirection to stay focused on Caden and not discuss her own situation or other inappropriate topics. She struggled with not telling Caden that he would return home, becoming hostile and aggressive when instructed to support his stabilization in foster placement. The social worker recommended that visitation be reduced in order to support the prospective adoptive placement with the current caregiver.

Caden's foster placement was again derailed in May 2017 when his foster parents asked that he be removed. As with several previous placements, the foster parents "expressed a concern about the involvement of the mother and on-going visitation contact with Caden as being the primary reasons for the child not being able to connect and settle into a permanent home." Mother had indicated at visits that she would find the confidential placement and would "exhaust the court process" to prevent finalization of any adoption. Under the circumstances, Ms. H. agreed to take Caden back for the summer.

A group of 11 social workers, foster care mental health clinicians and others— including Caden's social worker and the minor's long-term therapist—convened in May to review Caden's visitation, placement status, and permanent plan. The review team consensus was that, while Caden had "a connection" with his mother, it was "not

---

(A151263), dism. Aug. 30, 2017). After consolidation of the appeals, mother's appellate counsel filed a no-issues brief pursuant to *In re Sade C.* (1996) 13 Cal.4th 952, 994 and *In re Phoenix H.* (2009) 47 Cal.4th 835, 844–846, resulting in the dismissal of both matters. (See *C.C. v. Superior Court*, *supra,* A151400.)

healthy" and had been "sabotaging to his stability in placement." The review team agreed Caden's visits with mother should be reduced.

At the contested hearing on May 24, 2017, the Agency sought a gradual reduction in mother's visitation to once per month. It also sought transfer of mother's educational rights to a surrogate so that any future adoptive placement and school for the minor could remain confidential. Mother objected to the proposed reduction in visitation and stated "she had always been a good parent and there was no substantiality to any of the reasons she was losing her child. Mother did not deny she was an addict. She testified: 'I get the purpose that I can't use meth. I don't get the fact that anyone can show me to be unfit because I use meth.' " (*C.C. v. Superior* Court, *supra*, A151400.) The juvenile court adopted the Agency's recommendations, reducing mother's visitation, limiting her educational rights, and setting a permanency planning hearing for Caden pursuant to section 366.26.[4]

## E.    *Permanency Planning Hearing*

The permanency planning hearing was held over several dates in January and February 2018. Agency reports filed in advance of the hearing indicated that Caden was doing well in his placement and had a supportive relationship with Ms. H. The minor had also developed solid relationships with Ms. H.'s partner and two children and was not displaying any mental health, emotional, or behavioral issues. In September 2017, Ms. H. expressed a desire to provide Caden with a permanent home through adoption. The social worker noted that Caden was "the most content and comfortable in his placement, education, and relationships with others than he [had] ever been."

Mother's contact with Caden was reduced to once per month as of July 2017. The social worker evaluated the minor's adjustment and saw no concerning behaviors either in placement or school as a result of the decrease in contact. Mother's limited visitation with the minor was reported to be generally appropriate. However, at a June visit, mother

---

[4] Mother filed a writ petition in this court, and, on August 28, 2017, we issued an unpublished opinion upholding the juvenile court's setting order. (*C.C. v. Superior Court*, *supra*, A151400.)

10

told the visitation supervisor she spent her days in bed drinking "creamsicles"—a mixture of vodka, orange juice, and cream.

Caden's half sibling N.C.-G. was living with mother in August 2017, and a child welfare referral had been received concerning mother's substance abuse. Mother was asked to drug test by Marin CPS but refused to do so. By November, the paternal grandmother had decided to relinquish guardianship of N.C.-G. N.C.-G. reported that mother was selling psychotropic and ADHD medication to others and she observed mother smoking methamphetamine in the apartment. In December, Marin CPS reported that mother sent disturbing and harassing text messages to N.C.-G. in response to N.C.-G.'s statements about her mother's relapse. Mother texted that she did not love N.C.-G. and that Caden hates her. The messages caused N.C.-G. " 'massive anxiety,' " posing a risk that she could be psychiatrically detained pursuant to section 5150. As a result, N.C.-G. did not have contact with mother and the court asked N.C.-G. to block mother's access to her social media. According to Caden's social worker, N.C.-G.'s situation with mother was a factor supporting the Agency's recommendation of adoption for Caden.

In November 2017, the social worker met with Caden at school and told him that Ms. H. wanted "her home to be his 'forever home.' " Caden asked the worker to define adoption, and she explained that Ms. H. would become his parent and continue to care for him as she was doing. The minor stated that would "be good" and that he would stay with Ms. H. "until he was big, able to get his own job, and buy his own house." Caden asked if he would still be able to see his mother and was told that there would be some visits resembling what he was doing and that the adults would work out a plan that was best for everyone. According to Ms. H., when Caden discussed adoption with her later that day he was very excited and happy. The next day when the social worker came by to discuss permanency, Caden was initially smiling and giggling. However, when asked how he felt about Ms. H. providing him a forever home, he responded " 'sort of and it will be good.' " He then started to cry and stated he wanted to live with mother. When the social worker explained he could not return to mother because she needed to work on

herself, the minor became flustered and tearful. However, after Ms. H. sat on the floor with Caden with her head to his head, soothing him and validating his feelings of loss, Caden stopped crying and began talking about the holidays with Ms. H. Although the Agency recognized that Caden will need ongoing support to address the trauma, attachment, and separation from mother, it believed his placement with Ms. H. "is able to provide him that comfort and security that will allow him to process his feelings and continue to grow healthy developmentally."

Dr. Alicia Lieberman filed a clinical consultation report dated January 6, 2018, opining that adoption by Ms. H. "is the placement decision with the best chance of supporting Caden's emotional health in the present and his prospects for becoming an emotionally healthy adult in the future." Dr. Lieberman had been a clinical consultant for the Agency since 1985 and was qualified as an expert in parent-child bonding and attachment, with specific focus on childhood trauma and its impact on children. Dr. Lieberman was familiar with Caden's case, having attended numerous administrative reviews concerning Caden with the social worker, and having joined in the group recommendation that mother's visitation with Caden be reduced.

Dr. Lieberman identified Ms. H. as the "only caregiver who has enabled Caden to feel that he is in the care of a consistent and predictable adult who keeps him safe and reliably looks out for his physical and emotional needs." (Underscoring omitted.) Ms. H. was able to foster a supportive relationship with mother during Caden's initial placement with her in 2014 "that helped Caden maintain an emotional bridge between the two caregivers. When Caden was returned to his mother's care between July 2014-June 2016, Ms. [H.] maintained contact with the child through telephone and visitations, including weekend visits to her home." Dr. Lieberman concluded that Caden relates to Ms. H. as a " 'secure base' "—a term used in attachment theory "to describe an adult that the child perceives as a reliable protector at times of uncertainty and fear." (Underscoring omitted.) While Caden showed expected sadness and distress when he realized he could not return to mother, his responsiveness to Ms. H.'s comfort and validation of his feelings was a "promising sign," indicating the minor's "emotional

12

alignment with the safety represented by staying with Ms. [H.], while also being able to feel appropriate sadness about not living with his mother." Dr. Lieberman found it telling that the school reported no deterioration in Caden's behavior when mother's visits were reduced, indicating that Caden's "emotional stability is supported by his placement with Ms. [H.]."

Dr. Lieberman noted that Caden was a developmentally vulnerable child with a diagnosis of PTSD and exposure to traumatic events from an early age, including having "a mother with psychiatric problems and engaged in substance abuse; witnessing domestic violence; homelessness; instability of living arrangements; repeated and prolonged separation from mother; witnessing repeated episodes of maternal anger and emotional dysregulation; and lack of consistent access to protective factors such as reliable surrogate caregivers." According to Dr. Lieberman, research studies indicate that "[e]xposure to 4 or more types of these childhood adversities is associated . . . with exponentially higher risk for psychiatric problems." The best course of action to alleviate the long-term effect of these risk factors is "safe and predictable caregiving." Indeed, in light of Caden's learning disabilities, Dr. Lieberman viewed "stability of placement with a caring and reliable caregiver" as "*an imperative*." (Italics added.) Finally, despite Caden's love for his mother, Dr. Lieberman opined that any placement other than adoption would pose "an unacceptable risk" to the minor's well-being, given mother's "continued emotional instability and damaging behaviors," such as her interference with the stability of Caden's placements and her recent inability to provide safe care for N.C.-G. In contrast, adoption would allow Ms. H. "to use her best judgement [*sic*] to manage the relationship between Caden and his mother in ways that would support the child" and thus represented "the least detrimental course of action" for the minor.

In support of her position, mother submitted a letter, which Caden apparently dictated to his therapist in February 2017, asking to be returned to mother. Among other things, the letter stated: "I would rather torture myself then [*sic*] not go back to her. I really would, that's actually the truth." Caden's letter stated regarding mother: "She is

13

perfectly fine. And I love her more than she can think. And she loves me more than I can think."

Mother also presented a bonding study prepared by Dr. Hugh Molesworth, whom the juvenile court later qualified as an expert in child psychology, bonding studies, and the parent-child attachment. Dr. Molesworth observed mother and Caden together for five and one-half hours in July and August 2017. He also met with Caden separately for 45 minutes, had two individual meetings with mother to gather history, reviewed relevant records, and interviewed Caden's long-term therapist. Dr. Molesworth specified that the study was limited to a discussion of the relationship bond between mother and Caden. He did not consider mother's parenting capacity, mother's psychological functioning, or Caden's relationship with others.

According to Dr. Molesworth, Caden's therapist opined that Caden was strongly connected to mother in that "he is sad not [to] see her, he consistently misses her, he is unchanging in his desire to go back to her, and he longs to be with her." (Italics omitted.) When meeting with Caden alone, Dr. Molesworth asked the minor how much he missed his mom, with 10 being the highest "missing feeling" and one being the lowest. Caden responded: " '100, no more than 100, a million, no trillions.' He went on to say—'is there a number more than a trillion?' I said there was and he said—'that's how much.' " When asked how much he thinks about his mother, the minor had a similar response. Caden stated he misses her so much because "she's my mom."

Dr. Molesworth concluded Caden's bond with mother "is substantial, rising to the level of a maternal attachment." The positive nature of the bond was evinced through Caden's excitement to see mother, their physical affection, Caden's verbalization of missing his mother, his declarations of love, his fear of limited contact, his sharing of "hurts" with mother, and his expression of affection at departures. Dr. Molesworth noted an "easy, comfortable, and intimate rapport between Caden and his mother" and characterized their relationship as "clearly positive." Caden's comments about missing mother and his letter to the court showed the depth of his feelings. However, Dr. Molesworth cautioned that mother was "likely . . . on her best behavior" and not

14

under the influence of drugs during his observations, which would affect her ability to respond appropriately to Caden. He acknowledged that if mother "was unable to parent Caden due to her substance abuse or mental health issues on an ongoing everyday chronic basis, that's an issue."

Dr. Molesworth described Caden as a vulnerable child with a diagnosis of PTSD and a learning disability. He opined that Caden "has an undeniable positive bond with his mother and that he derives substantial emotional sustenance and benefits from it." He observed, however, that while mother "is at the center" of Caden's emotional life, the minor also has an "intense pre-occupation" with mother which could indicate a "narrowness of his bond with her" that could get in the way of his developing relationships or connecting with others. Dr. Molesworth found it likely that a loss of contact with mother would be traumatic and have a harmful effect on Caden. There was a risk such a loss would result in distress that is likely to endure and lead to a "life-long psychological wound." Additionally, "[t]here is a risk the loss will accelerate his emotional issues and further compromise his already impaired learning skills. If he were to lose his mother his already existing preoccupations and feelings of loss would be exponentially amplified—making it even harder to think, process, focus, and attend effectively in school."

At the permanency planning hearing, the juvenile court heard testimony from the social worker, mother, both experts, and various character witnesses called by mother. Mother's subpoena of the minor to attend was quashed based on the potential for "substantial trauma" if the minor was forced to testify. On February 8, 2018, the juvenile court found Caden adoptable. However, it declined to terminate parental rights. The court continued the matter to determine whether Ms. H. would be willing to act as Caden's legal guardian. At the continued hearing, the Agency informed the juvenile court that Ms. H. was unwilling to accept legal guardianship of Caden due to concerns her family would not be able to handle mother's ongoing demands regarding visitation and phone contact. Ms. H. stressed she felt unable to set firm boundaries with mother without the proper legal authority. Ms. H. also worried mother would continue to use the

15

court process in ways that would disturb Caden's emotional stability in his placement, and expressed some fear for her family's safety. Consequently, the juvenile court ordered a permanent plan of long-term foster care for the minor in March 2018. Timely appeals filed by both the Agency and Caden's dependency counsel (who has represented the minor since his initial removal in September 2013) now bring the matter once again before this court.

## II. DISCUSSION

The Agency and Caden join in raising a single contention on appeal. They claim the juvenile court erred in determining that mother had successfully established the beneficial relationship exception, thereby avoiding termination of her parental rights and blocking Caden's adoption. We agree.

### A. *Legal Framework*

At a permanency planning hearing held in accordance with section 366.26, the juvenile court is charged with determining the most appropriate permanent plan of out-of-home care for a dependent child that has been unable to reunify. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50 (*Casey D.*).) When reunification efforts with a parent fail, as they did in this case, the focus shifts from family preservation "to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1163 (*G.B.*); *In re Jason J.* (2009) 175 Cal.App.4th 922, 935.) Thus, permanency planning hearings, as the name implies, are "designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52–53 (*Celine R.*).) As the most permanent of the available options, adoption is the plan preferred by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) Indeed, when a court finds that a child is likely to be adopted if parental rights are terminated, it *must* select adoption as the permanent plan unless it finds a "compelling reason for determining that termination would be detrimental to the child" due to one or more of the statutory circumstances

16

delineated in section 366.26. (§ 366.26, subd. (c)(1)(B); *In re A.A.* (2008) 167 Cal.App.4th 1292, 1320 (*A.A.*).)

These "specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Celine R.*, *supra*, 31 Cal.4th at p. 53.) The statutory exception at issue in these proceedings—the beneficial relationship exception—applies where termination of parental rights would be detrimental to the child because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The parent has the burden of proving, by a preponderance of the evidence, that the beneficial relationship exception applies. (See *In re Breanna S.* (2017) 8 Cal.App.5th 636, 646 (*Breanna S.*); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.) A court's determination that "a parent has not satisfied this burden may be based on any or all of the component determinations—[(1)] whether the parent has maintained regular visitation, [(2)] whether a beneficial parental relationship exists, and [(3)] whether the existence of that relationship constitutes 'a compelling reason for determining that termination would be detrimental to the child.' " (*Breanna S.*, at pp. 646–647; see § 366.26, subd. (c)(1)(B)(i); *In re K.P.* (2012) 203 Cal.App.4th 614, 622 (*K.P.*); *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).)

The first prong of a beneficial relationship analysis "is quantitative and relatively straightforward, asking whether visitation occurred regularly and often." (*In re Grace P.* (2017) 8 Cal.App.5th 605, 612 (*Grace P.*).) "It is not an inquiry into the quality of visitation; this prong simply evaluates whether the parent consistently had contact with the child." (*Id.* at p. 613.) Thus, for purposes of the beneficial relationship exception,

17

"[r]egular visitation exists where the parents visit consistently and to the extent permitted by court orders." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212 (*I.R.*).)

In contrast, whether the nature and extent of a particular parent-child relationship is sufficient to be deemed "beneficial" for purposes of this exception is a more involved inquiry, made on a case-by-case basis by taking into account the many variables which affect the parent/child bond. Relevant factors include the age of the child, the portion of the child's life spent in the parent's custody, the positive or negative effect of interaction between parent and child, and the child's particular needs. (*Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575–576; see *In re Angel B.* (2002) 97 Cal.App.4th 454, 467.) These factors are not exclusive. (*Grace P.*, *supra*, 8 Cal.App.5th at p. 613.) Rather, "[t]he application of the beneficial parent relationship exception requires a robust individualized inquiry given that '[p]arent-child relationships do not necessarily conform to a particular pattern' and no single factor . . . is dispositive." (*Ibid.*)

Of necessity, however, the relationship at issue must be parental. "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' " (*K.P.*, *supra*, 203 Cal.App.4th at p. 621; see *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419 (*Beatrice M.*).) Such a relationship "characteristically aris[es] from day-to-day interaction, companionship and shared experiences." (*Casey D.*, *supra*, 70 Cal.App.4th at p. 51; see *Autumn H., supra,* 27 Cal.App.4th at p. 575 ["The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation."].) But day-to-day contact is not always required. (*Casey D.*, at p. 51.) Rather, for the beneficial relationship exception to apply, the court must find that "regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H.*, at p. 575.)

Should a parent demonstrate the existence of a parent-child relationship so significant that its severance would cause the child detriment, the juvenile court must then determine whether that relationship constitutes a "compelling" reason to forgo

termination of parental rights under the balancing test announced by *Autumn H.* (See § 366.26, subd. (c)(1)(B).) Specifically, the parent must establish that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) In evaluating this issue, the court must balance "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*) When a juvenile court takes the extraordinary step of concluding that the beneficial relationship exception applies, it must state the reasons supporting its determination in writing or on the record. (§ 366.26, subd. (c)(1)(D).)

Finally, under subdivision (h)(1) of section 366.26, the juvenile court must consider the wishes of the child during permanency planning proceedings. However, as with the other exceptions described in section 366.26, subdivision (c)(1), the court must analyze the beneficial relationship exception within the context of the child's best interests. (§ 366.26, subd. (h)(1); *In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1165 (*Tabatha G.*).) Even when a child loves his or her parents and desires continued contact with them, the court may nonetheless terminate parental rights if doing so is in the child's best interests. (§ 366.26, subd. (h)(1); *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 955.)

Appellate courts are divided over the appropriate standard of review for an order concerning the applicability of the beneficial relationship exception to termination of parental rights. Indeed, in our own First District, we have variously found a juvenile court's decision in this regard reviewable for abuse of discretion (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*)), for substantial evidence (*G.B.*, *supra*, 227 Cal.App.4th at p. 1166), and, most recently, by a combination of the two. (*In re E.T.* (2018) 31 Cal.App.5th 68, 76, petn. for review pending, petn. filed Feb. 19, 2019 (*E.T.*) [applying substantial evidence standard to "the factual issue of the existence of a

beneficial parental relationship"; applying abuse of discretion standard to whether that relationship provides "a compelling reason for finding that termination would be detrimental to the child"].)  We join those appellate courts that have taken a hybrid approach.  Underlying factual determinations—such as whether a parent has maintained regular visitation or whether a beneficial parental relationship exists—are properly reviewable for substantial evidence.  (*E.T.*, at p. 76; *Breanna S.*, *supra*, 8 Cal.App.5th at p. 647; *K.P.*, *supra*, 203 Cal.App.4th at pp. 621–622.)  In contrast, a juvenile court's determination whether such a relationship provides a compelling justification for forgoing adoption "is *based* on the facts but is not primarily a factual issue." (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)  Rather, it is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption."  (*Ibid.*; see *Jasmine D.*, at p. 1351.)  Intrinsic to a balancing of these interests is the exercise of the court's discretion, properly reviewable for abuse.  (*E.T.*, at p. 76; *Bailey J.*, at p. 1315.)

Our review under both of these standards is well established.  In reviewing for substantial evidence, "[w]e do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.  Instead, we draw all reasonable inferences in support of the findings, view the record in favor of the juvenile court's order and affirm the order even if other evidence supports a contrary finding."  (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161–1162.)  In contrast, " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' "  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319; see *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351 [an appellate court may reverse for abuse of discretion where, based on the evidence viewed most favorably in support of the challenged order, no reasonable judge could have reached the same result].)  Findings of fact underlying the court's exercise of discretion must still be supported by substantial evidence.  (*In re A.R.* (2015) 235 Cal.App.4th 1102,

20

1117.)  Whether the juvenile court abused its discretion in a particular instance "is further informed by the statutory context within which its decision . . . was made." (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1288 (*Jaden E.*).)

## B.  *Application of Beneficial Relationship Exception in this Case*

The juvenile court found Caden adoptable at the conclusion of the permanency planning hearing, and mother does not challenge this finding on appeal.  Under the statutory framework discussed *ante*, the juvenile court was thus *required* to terminate parental rights and designate adoption as Caden's permanent plan, absent proof  of a "compelling reason for determining that termination would be detrimental to the child" due to an articulated statutory circumstance such as the beneficial relationship exception. (§ 366.26, subd. (c)(1)(B); *A.A.*, *supra*, 167 Cal.App.4th at p. 1320.)

In concluding that the beneficial relationship exception applied in this case, the juvenile court first found regular visitation, stating:  "The record shows Mother's devotion to Caden and that she has maintained consistent regular visitation and contact with Caden.  The court believes that those visits have continued the significant emotional attachment that Caden and his Mother created prior to his removals."  On appeal, the Agency argues mother did not have regular contact with Caden for purposes of establishing this exception because her visits with Caden had been reduced to only once a month and, even during those brief visitations, mother struggled to stay focused on the minor.  These arguments appear to address the *quality* of mother's contacts with Caden rather than the consistency of mother's visitation.  Mother need only demonstrate that she visited with Caden "consistently and to the extent permitted by court orders." (*I.R.*, *supra*, 226 Cal.App.4th at p. 212.)  Substantial evidence supports the juvenile court's determination that mother did so.  After Caden was detained a second time, mother visited with Caden to the extent allowed, except for a few missed visits after the denial of her modification petition in April 2017.  Her visitation during the minor's first removal was similarly consistent.

In support of the second prong—the existence of a beneficial relationship—the juvenile court made the following express findings:  (1) mother had been Caden's

"primary caregiver" for "approximately six out of his eight and a half years of life"; (2) mother stood "in a parental role to her son"; (3) Caden "loves his mother, and derives benefit from his visits with her"; (4) mother has "maintained her deep commitment and emotional relationship with Caden throughout this process both when he was in and out of her care";[5] (5) Caden, a "mature 8 year old," had directly communicated his love for mother and his desire to return to her to the court, both through his February 2017 letter and through minor's counsel; and (6) both Dr. Molesworth's bonding study and Dr. Lieberman's clinical consultation report demonstrate that mother and Caden "have a consistent and positive relationship."

Minor's counsel argues that the juvenile court's observation that mother had been Caden's "primary caregiver" for six out of his eight years of life is not supported by substantial evidence. We disagree. Caden was in mother's sole care for the first four years three months of his life, prior to his initial detention. He was then returned to her care under a family maintenance plan from July 2014 through June 2016. While it is true that Caden lived with mother in residential treatment from July 2014 until her discharge in March 2015, mother was primarily caring for Caden's day-to-day needs, albeit in a supervised setting. Even without their time together in residential treatment, mother was solely responsibility for the minor for approximately five and one-half years. We will not quibble with how the juvenile court counted months. The point is, mother was Caden's primary caretaker for a significant period of the young minor's life and that conclusion is amply supported by the record.

Minor's appellate counsel also takes issue with the juvenile court's finding that Caden had "directly communicated" with the court his love for mother and his desire to return to her via his February 2017 letter. Counsel asserts that the letter was a year old at the time of the permanency planning hearing, questions were raised about its credibility,

---

[5] The juvenile court's written order ascribes this maintenance of a deep commitment and emotional relationship to Ms. H., not mother. Whichever statement the juvenile court actually intended, we believe both versions to be supported by substantial evidence.

and the letter was created before Caden was placed with Ms. H., when he was in a placement that was not meeting his needs. We need not address the parties' competing views about the letter, however, because Caden has consistently expressed that he loved his mother and wanted to live with her—from his initial detention in September 2013, when he cried and stated he wanted to " 'go back and live in the car with my mom,' " to November 2017, when he cried and stated he wanted to live with mother after being told he would be remaining with Ms. H. Substantial evidence supports this fact, and it is clearly relevant to the depth of Caden's bond with mother.

Finally, the Agency argues that mother's ongoing monthly contact with the minor was insufficient to support a finding of significant parent-child attachment. The Agency's argument seems to be that mother's relationship with Caden was not "parental" due to the infrequency of the contacts. Setting aside that mother fought against a reduction in visitation, "[a] strong and beneficial parent-child relationship [may] exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) What matters is that "regular visits and contact have continued . . . a significant, positive, emotional attachment from child to parent." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) It is clear on this record that the minor saw mother as his parent and continued to have a significant emotional attachment to her from which he derived benefit. Thus, viewing the evidence in the light most favorable to the court's order, we conclude this finding is also supported by substantial evidence.

At bottom, it cannot be seriously disputed that Caden had a beneficial relationship with mother—that is, a significant relationship the termination of which would cause him detriment. While Dr. Molesworth's bonding study is the most eloquent expression of this bond, Dr. Lieberman also acknowledged it, stating that Caden "has a very strong emotional bond with his mother" and that the bonding study provides "a compelling description of Caden's love for his mother." The record is replete with comments from various care providers attesting to the significance of the bond between mother and son. We thus have little difficulty concluding substantial evidence supports the juvenile

23

court's implicit finding that a beneficial relationship existed here between the minor and mother. But as Caden's social worker aptly observed on the eve of the permanency planning hearing: "Caden's connection to his mother has never been the cause for his removal." In other words, the existence of a strong mother-child bond is far from the end of our inquiry.

Having found the existence of a beneficial relationship between mother and Caden, as well as regular visitation, the juvenile court was charged finally with determining whether that relationship provided "a compelling reason" for concluding that termination of parental rights should not be pursued, despite Caden's adoptability. (See § 366.26, subd. (c)(1)(B).) In determining that the statutory exception applied, the court found: "The record does show that while Caden has a strong and developing relationship with Ms. [H.,] that relationship in and of itself does not negate the harm that Caden would experience from the loss of his most significant emotional relationship. And that is with his mother." Moreover, "[s]evering Caden's relationship with his Mother would deprive Caden of a positive emotional attachment and greatly harm Caden. [¶] Accordingly, the Court finds based upon all the foregoing that Mother has established that the continuing beneficial relationship exception to the termination of parental rights applies in this case and that that relationship outweighed any prospective adoption. The Court finds that in this circumstance, termination of parental rights would be detrimental to Caden."

We conclude this is one of the rare and difficult cases in which the juvenile court's application of the beneficial relationship exception amounted to an abuse of discretion. On this record, no reasonable judge could have concluded that a compelling justification was made to forgo adoption and order a permanent plan of long-term foster care for Caden. As we explain below, two overarching considerations guide our analysis. First, the juvenile court's determination that mother had "substantially complied with her case plan" and "continues her efforts to maintain her sobriety and address her mental health issues" is not supported by the record. Second, the court gave short shrift to uncontroverted evidence that long-term foster care posed substantial risk of further

24

destabilizing a vulnerable child, fostered unhealthy and sometimes "toxic" interactions between mother and child, and robbed Caden of a stable and permanent home with an exceptional caregiver.

If anything is clear from this record, it is that Caden has suffered years of trauma and instability as a direct result of mother's entrenched and unresolved substance abuse and mental health issues—the very problems that led to Caden's removal from her care in the first place. Mother has repeatedly, over the course of 30 years, been unable to maintain her sobriety outside of a structured treatment setting. Contrary to the juvenile court's finding, the evidence discloses that mother's chronic substance abuse and failure to seek treatment continued unabated up to the permanency planning hearing.

Mother's last case plan in this matter was approved by the court in January 2016 and required, among other things, mother's engagement in intensive outpatient treatment. It was terminated as unsuccessful in June 2016—when Caden was removed a second time—due to mother's failure to engage in services and active drug use. (*C.C. v. Superior Court*, *supra*, A151400.) Thereafter, although the Agency provided no further services to mother, she successfully completed a 60-day residential program on August 30, 2016, and engaged in outpatient treatment and a number of other services. Almost immediately after her discharge from a residential setting, however, mother again tested positive for methamphetamine. Mother filed a modification petition in January 2017, detailing her participation in services, including Family Treatment Court, NA/AA meetings, outpatient treatment, and medication management. However, between January and April 2017, while her modification petition was pending, mother missed multiple drug tests and tested positive for methamphetamine. (*C.C. v. Superior Court*, *supra*, A151400.) The last indication in the record that she attended any treatment was in March 2017. She was discharged from Family Treatment Court due to her disengagement from treatment.

In April 2017, the Agency confirmed that, over the previous eight weeks, mother "had tested positive for buprenorphine and methamphetamine, had missed numerous drug tests, had stopped attending drug treatment, and had not provided proof of individual

25

therapy attendance." (*C.C. v. Superior Court*, *supra*, A151400.) In June 2017, mother self-reported that she was spending her days in bed drinking "creamsicles"—a mixture of vodka, orange juice, and cream. Her daughter N.C.-G. reported in August 2017 seeing mother smoking methamphetamine and selling psychotropic and ADHD medication to others. Mother was asked to take a drug test by Marin CPS to allow further contact with N.C.-G., but mother refused. (See *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1304 (*Noah G.*) ["common sense suggests a parent who consistently fails to appear for drug tests does so because of a consciousness of guilt"].) Finally, mother did not produce any evidence at the January 2018 permanency planning hearing that she was engaged in treatment of any kind.

There is thus *no* evidence in the record that mother attempted to maintain her sobriety or seek treatment to address her addiction and mental health issues in the 10 months prior to the permanency planning hearing and, indeed, the clear implication is that mother was, again, actively using. Equally concerning, mother's recent statements reflected the same lack of awareness about the consequences of her substance abuse that she had demonstrated at the beginning of this case. At the six-month postpermanency review in May 2017, she testified: " 'I get the purpose that I can't use meth. I don't get the fact that anyone can show me to be unfit because I use meth.' " (*C.C. v. Superior Court, supra*, A151400.) More recently, she testified repeatedly at the permanency planning hearing that, while she was an addict, her drug usage did not negatively impact her ability to parent Caden.

Under similar circumstances, a number of courts have found application of the beneficial relationship exception inappropriate. (See *Noah G.*, *supra*, 247 Cal.App.4th at pp. 1302, 1304 [in considering the beneficial relationship exception, "the juvenile court could properly focus on the mother's unresolved substance addiction issues because the children became dependents of the court due to her drug abuse"; citing mother's continuing drug abuse as "evidence continuing the parent-child relationship would not be *beneficial*"]; *Breanna S.*, *supra*, 8 Cal.App.5th at p. 648 ["in balancing the benefit to [the children] of adoption and the possible detriment from terminating their relationship with

26

their mother, the juvenile court properly expressed concern over the continuing violence that characterized [the mother's] relationship with [the father], the very reason that dependency jurisdiction was exercised in the first place"].)  In *In re Marcelo B.* (2012) 209 Cal.App.4th 635, the parents—chronic alcoholics—had successfully reunified in a prior dependency case and then "promptly relapsed."  (*Id.* at p. 643.)  "More ominously, both denied the extent of their alcohol abuse and its negative impact on their ability to parent Marcelo."  (*Ibid.*)  In upholding the juvenile court's refusal to apply the beneficial relationship exception in that case—despite the fact the parents had "demonstrated that they have a warm and affectionate relationship with their son"—the appellate court opined:  "We are sorry for the parents who, notwithstanding their alcoholism, love their son.  This is not enough. . . .  The Legislature has determined that the protection of the child is paramount."  (*Id.* at pp. 644–645.)

Conversely, in cases where application of the beneficial relationship exception has been found or upheld, the parents were actively involved in maintaining their sobriety or complying substantially with their case plan.  For example, in the seminal case of *In re S.B.* (2008) 164 Cal.App.4th 289, the father admitted to using methamphetamine " 'on and off' " for 30 years.  (*Id.* at p. 293.)  However, after the child was removed from the father's custody, he complied with every aspect of his case plan including maintaining his sobriety.  (*Ibid.*)  The child welfare agency acknowledged " 'consistent efforts' " on the father's part " 'to alleviate and or mitigate the reasons his family was brought to the attention of the court.' "  (*Id.* at p. 294.)  In concluding the beneficial relationship exception applied, the appellate court reasoned that father's full compliance with the case plan evidenced his constant devotion to the child's welfare.  (*Id.* at pp. 300–301; see *In re Amber M*. (2002) 103 Cal.App.4th 681, 686–687, 690–691 [concluding the juvenile court erred in refusing to apply the beneficial relationship exception where mother had been clean for 372 days, was "progressing in treatment," was devoted to her children, and "did virtually all that was asked of her to regain custody"]; *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1535 [upholding beneficial relationship exception where mother visited weekly, maintained a suitable residence for six months, was employed, and was

participating in substance abuse treatment]; *E.T.*, *supra*, 31 Cal.App.5th at p. 78 [reversing juvenile court's rejection of beneficial relationship exception where mother voluntarily reported her drug relapse and sought treatment and support, remained in treatment and stayed sober for more than nine months, and "did all she was asked to do and more"].)

In the present case, mother failed to engage in her case plan or seek treatment of any kind in the 10 months leading up to the permanency hearing, was actively abusing drugs again, and was in denial about her ability to parent under the influence of methamphetamine. Mother once understood that Caden's emotional and physical well-being had been placed at significant risk by her drug addiction and untreated mental health issues, and it is disheartening to see those lessons forgotten. No reasonable court would apply the beneficial relationship exception on this record of mother's disengagement from treatment and case plan, inability or unwillingness to remain sober, and deficient insight regarding her parenting.

Our review of the record also compels the conclusion that long-term foster care was not in Caden's best interests. The juvenile court was required to balance "the strength and quality of the natural parent/child relationship in a *tenuous* placement *against* the *security and the sense of belonging* a new family would confer." (*Autumn H., supra,* 27 Cal.App.4th at p. 575, italics added.) The question is not, as the court's findings seem to imply, whether mother's parental bond trumped the bond Caden shared with his current caregiver. It is instead an inquiry into whether mother's bond with Caden was such a positive influence on his young life that an uncertain future is an acceptable price to pay for maintaining it. (See, e.g., *In re Anthony B.* (2015) 239 Cal.App.4th 389, 396 ["The issue here is not whether there was a bond between Father and [child]. The question is whether that relationship remained so significant and compelling in [the child's] life that the benefit of preserving it outweighed the stability and benefits of adoption."]; see also *Tabatha G.*, *supra*, 45 Cal.App.4th at p. 1165 [the exceptions to adoption set forth in section 366.26, subdivision (c)(1) "are a final check to

28

ensure termination of parental rights is in the best interests of the minor and is the *least detrimental* alternative" (italics added).)

The juvenile court's bare assertion that the "relationship [between Caden and mother] outweighed any prospective adoption" sheds no light on *how* the court balanced these competing detriments. In the absence of any explanation, we look to the evidence as a whole to ascertain if it supports the juvenile court's determination. We conclude it does not. At the time of the permanency planning hearing, legal guardianship was not a viable option. The only remaining alternative—foster placement—had already proved itself destabilizing, with Caden removed from four different homes due to mother's constant interference and efforts to undermine the foster families. When we previously affirmed the juvenile court's order reducing visitation, we concluded that "mother consistently fueled Caden's belief that he would soon return home, a belief that was unrealistic given mother's inability to cease using methamphetamine, and one that fostered anxiety in the minor and that undermined placement after placement." (*C.C. v. Superior Court*, *supra*, A151400.) In addition, the record discloses a recent example of a failed guardianship, N.C.-G.'s, which the social worker attributed to a long child welfare history characterized by "poor boundaries [and] a lack of protection for [N.C.-G.] regarding Mom being able to basically maneuver in and out of her life. . . . Hence, she's now a dependent at 16 years old."

Dr. Lieberman opined that, despite Caden's love for his mother, any placement other than adoption would pose "an unacceptable risk" to the minor's well-being, given mother's "continued emotional instability and damaging behavior" (underscoring omitted), such as her interference with the stability of Caden's placements and her recent inability to provide safe care for N.C.-G.[6] Dr. Lieberman identified Caden as a

---

[6] The juvenile court appears to have almost entirely ignored Dr. Lieberman's opinions, noting that she never interviewed or met Caden in person. While lack of personal contact would have been a basis to question the validity of a bonding study, Dr. Lieberman's report is not a bonding study. Rather—accepting the existence of the strong mother-child bond as described by Dr. Molesworth—Dr. Lieberman's report is the only expert evidence in the record that attempts to balance the detriments involved in this

29

developmentally vulnerable child with a diagnosis of PTSD and exposure to numerous traumatic events from an early age. Her uncontroverted testimony established that, because of these factors, Caden is at "exponentially higher risk" for future psychiatric problems and that the recommended course of action to alleviate the long-term effect of these risk factors is "safe and predictable caregiving." Dr. Lieberman added that in light of the minor's learning disabilities, "stability of placement with a caring and reliable caregiver *is an imperative* in efforts to protect his physical and mental health." (Italics added.) Dr. Molesworth agreed that Caden is a vulnerable child who has suffered significant trauma. Dr. Molesworth's bonding study focused on the harm that Caden would experience from losing contact with his mother, but it did not consider the harm that would befall Caden if mother continued to abuse drugs and was unable to reunify with him, if Caden cycled through more foster homes, or if mother continued undermining his foster placements. For an especially vulnerable child such as Caden, who has suffered significant trauma in his young life, the justification for blocking adoption must indeed be *exceptional*. Once it became clear at the February 2018 permanency hearing that Ms. H. would not agree to be Caden's legal guardian, and long-term foster care was the only alternative to adoption, this factor took on particular urgency.

The juvenile court's order also failed to address the substantial evidence that, although Caden enjoyed visiting with mother, their interactions were often detrimental to his well-being. Throughout these proceedings, mother persistently treated Caden as a peer rather than a child, exposing him to inappropriate and anxiety-provoking information. She showed an inability to focus on his needs, instead relying on the minor for her own emotional support. For his part, Caden felt the need to take care of mother

---

case and opine on the least detrimental alternative for the minor. Dr. Molesworth's report, in contrast, examined only the existence of a parental bond, and did not purport to opine on mother's parenting abilities, her psychological functioning or sobriety, or Caden's stability of placement with his current caregiver. That the juvenile court failed to appreciate this distinction suggests that it misapprehended the analytical task before it and assumed that establishment of a beneficial relationship was the end of the story.

and ensure her safety. These interactions led to what the social worker described as a "toxic" relationship, in which the "child is unable to separate from [mother] due to a high level of concern about her well-being" and he is "exposed to conversations that cause fear and create behaviors that jeopardize his safety, emotional well-being, and education." (*C.C. v. Superior Court*, *supra*, A151400.) In recommending reduced visitation, Dr. Lieberman stated that "the child's frequent contact with the parent who is unstable left the child in a state of heightened anxiety as he regularly needed to prepare himself for the visit." The 11-member review team concurred, finding that Caden's frequent visitation with mother was unhealthy and was sabotaging his stability. Dr. Lieberman described Caden's attachment to his mother as involving a damaging mixture of preoccupation and anger. Even in his own interactions with the minor, Dr. Molesworth observed the same "intense preoccupation" with mother that could interfere with his development of relationships with others. In short, there was overwhelming evidence in this case that, while mother's bond with Caden was undeniably strong, it was not of a quality that justifies disrupting a plan of adoption for the minor.

Finally, the evidence is compelling that Ms. H. was uniquely situated to provide this young, traumatized, and special needs minor with a healing and supportive permanent home. Ms. H. has shown a remarkable commitment to Caden's well-being since he was initially placed in her home over five years ago, regardless of where and with whom he was placed. Dr. Lieberman characterized Ms. H. as the *only* caregiver in Caden's life who had enabled him "to feel that he is in the care of a consistent and predictable adult who keeps him safe and reliably looks out for his physical and emotional needs." (Underscoring omitted.) This commitment has also allowed Ms. H. to act as the minor's secure base—the adult with whom he feels the most safe. She has demonstrated an ability to support, empathize, and acknowledge the legitimacy of Caden's sadness that he is not able to live with the mother he loves, a trait Dr. Lieberman identified as a protective factor against harm from loss.

Given all of these circumstances, when the strength and quality of mother's relationship with Caden in a tenuous placement is properly balanced against the security

31

and sense of belonging adoption by Ms. H. would confer, no reasonable court could have concluded that a compelling justification had been made for forgoing adoption. We therefore reverse the juvenile court's determination in this matter and remand with instructions to hold a permanency planning hearing pursuant to section 366.26, at which parental rights should be terminated and a plan of adoption ordered for Caden. We recognize, however, that the prior hearing in this matter occurred over a year ago and that childhood does not wait for the completion of our court process. Thus, it is possible that a significant change of circumstances may have occurred since the initial permanency planning hearing which points to a permanent plan other than adoption for this minor. We stress, though, that any deviation from the statutorily preferred plan of adoption must be in the minor's best interests. (§ 388; see *G.B.*, *supra*, 227 Cal.App.4th at p. 1157.) Finally, we note that mother's love for Caden is palpable. It is our hope that, moving forward, this strong and abiding love will allow mother to fully support Caden's clear need for a permanent alternative home.

### III. DISPOSITION

The judgment is reversed. The juvenile court is instructed to hold a new permanency planning hearing forthwith, at which parental rights should be terminated and a permanent plan of adoption ordered, absent a compelling showing by any party pursuant to section 388 that changed circumstances and Caden's best interests currently mandate some lesser level of permanency.

_____
Sanchez, J.

WE CONCUR:


_____
Humes, P. J.


_____
Margulies, J.

*A153925, A154042  In re Caden C.*

33

Trial Court:          San Francisco City and County Superior Court

Trial Judge:          Hon. Monica Wiley

Counsel:

Dennis J. Herrera, City Attorney, Kimiko Burton, Lead Attorney; Gordon-Creed, Kelley Holl and Sugerman, Jeremy Sugerman and Katie Curtis for Plaintiff and Appellant San Francisco Human Services Agency.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Respondent Christine C.

Michelle Danley, under appointment by the Court of Appeal, for Defendant and Respondent Brian C.

Deborah Dentler, under appointment by the Court of Appeal, for Appellant Minor Caden C.

*A153925, A154042  In re Caden C.*