Filed 12/17/20  In re G.D. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re G.D. et al., Persons Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, CHILD WELFARE BRANCH,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.D.,<br><br>        Defendant and Appellant. | A160259<br><br>(Humboldt County<br>Super. Ct. Nos. JV140213-1,<br>JV140213-2 & JV140213-3) |

In this dependency appeal, J.D. (father) challenges the termination of his parental rights with respect to his three children—G.D. (born February 2010), J.D. (born September 2013), and D.D. (born August 2014)—at a permanency planning hearing held pursuant to section 366.26 of the Welfare and Institutions Code.[1]  Father claims that his due process rights were violated because he did not receive adequate notice that the permanency planning hearing would be conducted over videoconference following the onset of the Covid-19 pandemic.  He also asserts that the court erred in

_____

[1] All section references are to the Welfare and Institutions Code unless otherwise specified.

1

terminating his parental rights with respect to all three siblings in light of his beneficial relationship with G.D. Seeing no error, we affirm.

## BACKGROUND[2]

This family first came to the attention of the Humboldt County Department of Health and Human Services, Child Welfare Branch (Department) in November 2012, when the Department substantiated an allegation of emotional abuse involving then two-year-old G.D. The incident included domestic violence in the minor's presence during which father screamed at mother and threw a plate at her face, causing profuse bleeding. Mother reported that father had a history of methamphetamine abuse and domestic violence, and father eventually admitted to being a methamphetamine user. He was court-ordered to complete a 52-week anger management program. In July 2014, after father had recently completed anger management and domestic violence classes, the Department received another referral reporting daily fights between the parents in front of four-year-old G.D. and nine-month-old J.D. The parents agreed to minimize fighting and keep it away from the children.

The family's first formal dependency proceeding commenced in August 2014 after D.D. tested positive for methamphetamine at birth. The Department had also observed father repeatedly under the influence of methamphetamine, including one incident during which he drove G.D. in a car while high. In addition, multiple domestic violence incidents had been reported to law enforcement during which the children were present. The children were taken into protective custody in December 2014 after D.D. was admitted to the hospital with a diagnosis of nonorganic failure to thrive. The

---

[2] J.W. (mother) has not challenged the termination of her parental rights and is not a party to these proceedings. Our factual recitation therefore includes information regarding mother only to the extent relevant.

referral also alleged that G.D. had been physically abused by mother and that father was caring for the children while under the influence of methamphetamine. Family reunification services were provided. In April 2015, the Department received another referral alleging the following incidents: father hit G.D. all over his body and beat up mother when she tried to intervene; G.D.'s two front teeth were dead due to severe trauma; G.D. had witnessed mother throw D.D. on the floor on her head; G.D. had nightmares and wet his pants and bed after visits with his parents; and he had attempted to strangle his care provider's dog. The parents eventually reunified with the children and after an additional six months of family maintenance services, this first dependency was dismissed in December 2015.

Over the next three years, the Department continued to receive referrals involving the family. In March 2017, for example, it was reported that father was using drugs again, the house was cold and dirty, with garbage and rotting food piled up, the children were filthy and inadequately supervised and appeared thin, and G.D. was not attending school. G.D. was observed eating a moldy bagel, and D.D. was eating dry pasta. When questioned, however, G.D. denied that the home was in poor condition and stated there was adequate food.

The Department became involved with the family again in September 2017 after a report that father's new girlfriend was living in the family home and using methamphetamine with father, leaving the children unsupervised. The parents agreed to a safety plan where they would care for the children during alternate weeks and agreed to engage in voluntary services. The next month, D.D. visited the emergency room after suffering an unexplained ruptured eardrum while in mother's care. Father refused to drug test and

did not engage in any of the offered services. The voluntary case was eventually closed in April 2018.

The Department next intervened in October 2018 when it was reported that father's girlfriend burned then four-year-old D.D. on her neck two times with a cigarette. Father was aware of the incident and failed to treat the injuries, which worsened to the point that a green, oozing substance was matted in the minor's hair and infection had spread up her neck and back. The home was full of dirty clothes, rotting food, garbage and debris, and the electricity and hot water had been cut off. The children reportedly did not bathe regularly and would often wear the same dirty clothes. Eventually, the maternal grandmother took D.D. to the emergency room for treatment and then to her home to recuperate.

When interviewed, D.D. stated she was burned by father's girlfriend after she attempted to retrieve a toy from a bedroom in which father and the girlfriend were fighting. G.D. confirmed D.D.'s account and reported that there were multiple people living in the home, father and his girlfriend fought every day, and that people smoked, had pipes, and drank. Investigating social workers found the house full of garbage and debris, with little food, and containing glass pipes, broken mirrors (one with a chopped up white substance), and multiple hypodermic needles within reach of the children. The children were taken into protective custody that day.

On October 16, 2018, the Department filed a dependency petition with respect to all three minors, alleging that D.D. came within the provisions of section 300, subdivisions (a) and (b)(1) and that G.D. and J.D. came within the provisions of section 300, subdivision (b)(1) and (j). At the detention hearing the next day, father appeared, counsel was appointed to represent

4

him, the minors were detained, and supervised visitation was ordered twice per week.

While the jurisdictional hearing was pending, the Department learned other concerning information regarding the family situation. J.D. reported that father and his friends threatened him with knives to get him to behave and that, when he and G.D. got into trouble, father would chase them around telling them he would kill them. G.D. was having intense anger outbursts and would try and stop J.D. from speaking up about any abuse, stating they would not be able to go home. Both boys were extremely small and underweight and would have tantrums when offered any kind of protein or whole food. The maternal grandmother reported that she had found the children alone at father's home with no food on multiple occasions, including one time in the summer of 2018 where the children were alone for three days and she encountered D.D. outside naked and extremely dirty. The only food in the home was dry pancake mix and an empty peanut butter container with a spoon in it that the children had shared over the past few days. Since 2000, father had been arrested 11 times and convicted on four occasions, including felony convictions for inflicting corporal injury on a spouse/cohabitant and possession of a controlled substance. At the jurisdictional hearing in December 2018, all parties submitted on the Department's report and the allegations in the petition were sustained by the juvenile court.

In its dispositional report, the Department identified the following four concerns for the family: (1) the parents had lengthy histories of methamphetamine abuse and had been unable to maintain sobriety despite prior drug treatment services; (2) the home was unsuitable due to the presence of drug paraphernalia and unsafe individuals; (3) father was arrested in 2003 for kidnapping and raping mother and their relationship

5

had been characterized by ongoing domestic violence; and (4) the parents had failed to provide proper nutrition and adequate food to the children. Father reportedly had developmental delays that qualified him for services through the Redwood Coast Regional Center, but he said the people there were " 'gay' " and he did not need their help. However, the social worker observed that father was able to track conversations, read text messages, and understand what the social worker was conveying to him. While both parents expressed a willingness to engage in services, father declined to provide his phone number to the social worker. Father's visitation was inconsistent and regularly late.

The children were placed together with a substitute care provider (SCP) and were improving. G.D. and J.D. had issues with emotional regulation and D.D. was highly energetic and defiant. All three children were referred for mental health assessment. At the uncontested dispositional hearing on January 10, 2019, father appeared with counsel. The juvenile court declared the children juvenile court dependents, authorized supervised visitation, and ordered reunification services for both parents.

Father had infrequent and limited communication with the Department during the first six-month period. He failed to engage in services and tested positive for methamphetamine in April 2019. Although father's twice weekly supervised visits were observed to be loving and appropriate, father declined the opportunity to liberalize visits and add extra time. Nevertheless, the Department noted some recent efforts and engagement by the parents and recommended an additional six months of reunification services on that basis.

All three children had been placed together with the same SCP since December 2018 and were reported to be physically healthy. However, the

6

trauma G.D. had experienced continued to impact his stability. Although he was seeing a counselor, he did not want to say anything that would affect his ability to reunify with his parents. J.D. loved his parents and expressed wanting to live with mother again. He continued to have difficulty regulating his emotions, soiled himself when upset, and demonstrated aggression towards his siblings and the SCP's dog. D.D. was having frequent nightmares, was extremely fearful of loud noises, and was scared of anything medical or dental. She stated she just wanted to live where her brothers were. Both court-appointed special advocates (CASA) for the children disagreed with the Department and recommended that services be terminated. Father appeared at the six-month review hearing with his attorney and submitted the matter to the court, which continued reunification services for the parents.

Over the next six months, father remained resistant to participating in services and provided many excuses to justify his lack of engagement. He openly admitted to using drugs, refused to drug test, lied about his participation in his substance abuse program, and refused to provide attendance records for the 12-step meetings he claimed he attended. Although father had positive interaction with the children during supervised visits, he struggled with timeliness and consistency. The Department now recommended that reunification services be terminated, and a permanent plan developed for the minors. The children's CASA emphatically agreed with this recommendation.

The minors were doing well in the home of the SCP, who expressed interest in adopting. The children continued to work on their mental health problems. J.D. struggled with emotional regulation and had an explosive temper. D.D. exhibited signs of posttraumatic stress disorder, including

7

regression in potty training, night terrors, and temper tantrums after visits with her parents. D.D. and J.D. stated they wanted to live with the SCP forever and visit their parents. G.D. stated he wanted to live with his mother and that his father needed to get power and water. He preferred guardianship with the SCP in hopes that his parents would eventually do what they needed to regain custody of him. According to the SCP, the children had a lot of anxiety regarding whether the parents would attend visits. At the January 2020 12-month review hearing, father appeared with counsel and objected to the Department's recommendation but provided no evidence on his own behalf. The juvenile court terminated reunification services and set the matter for a permanency planning hearing. Father did not challenge these orders.

On January 21, 2020, father was served with notice that the permanency planning hearing would be held at 8:30 a.m. on May 4, 2020, at the courthouse. Father's attorney was served with notice on March 6, 2020. In its report for the hearing, the Department acknowledged that the parents loved the children and that there was a "strong bond," but concluded: "At this time the parents' behavioral change is minimal. The goals and objectives in the parents' case plan remain incomplete, and the issues which justify the Department's involvement have not been mitigated." The Department further opined that the parents' lack of progress was confusing and further traumatizing to the children. Supervised visitation had been decreased from twice per week to twice per month and, although the parents at times had positive interactions with the children, they failed to plan and control the visits and would give the children false hope and make promises they could not keep.

All three children were well cared for by the SCP, who desired to provide them with a safe and permanent home. They continued to receive mental health services to deal with the behavioral issues resulting from the trauma they experienced in their parents' care. The Department recommended termination of parental rights and adoption by the minors' SCP, noting that any emotional bond the children had with their parents was not compelling enough to outweigh the benefits of adoption. Although the Department acknowledged that G.D. had previously stated he did not want to be adopted or change his name, the Department observed that all three children were comfortable in their caregivers' presence, viewed them as parental figures, were integrated into the current family system, and had a typical parent/child bond with the SCP. In addition, the children's CASA strongly believed that adoption was "the best path forward for all three children." Having spent nearly 300 hours with the children since December 2018, the CASA observed G.D. "transition from the state of this case where he was resistant to anything but returning to his parents, to then guiltily recognizing his life is better, to now accepting his situation and being a happy and carefree ten year old." The CASA further opined that J.D. was thriving in the ordered and structured environment and that D.D. was also doing well. G.D. had stopped mentioning his desire to go home, declining to speak about it since December 2019. Both J.D. and D.D. expressed fear at being returned to their parents, with J.D. specifically stating how scared he always was and how hungry they always were when they were in their parents' care.

The permanency planning hearing was held as scheduled on May 4, 2020, but was conducted via videoconference due to the COVID-19 pandemic. Neither parent was present, although father had submitted a statement filed by his attorney several days earlier "for consideration at the Section 366.26

9

hearing in lieu of testimony for the court's use in determining whether guardianship is the appropriate permanent plan in this case under an analysis of the beneficial relationship exception to termination of parental rights." The attached statement was an email dated April 29, 2020, in which father described his bond with his children and listed the things he was doing to address the issues which led to their removal. For example, father indicated that he was continuing to get his home in order and that, since the shelter-in-place order, he and his girlfriend had been attending Alcoholics Anonymous meetings "online daily."

Father's attorney expressed surprise that father was not present at the hearing, stating : "I don't know why he has not connected this morning other than perhaps their phone doesn't have any minutes on it." She then asked the court to admit father's statement into evidence and argued in favor of guardianship—especially for G.D.—"based on the beneficial relationship exception that my client is asking the Court to apply." Mother's attorney objected and submitted the matter, noting she had received no direction from her client since services were terminated and that mother's telephone number was disconnected. The Department's attorney, minors' counsel, and the CASA representative all argued that termination of parental rights and adoption was the most appropriate permanent plan for the three siblings.

At the conclusion of the hearing, the juvenile court commented that after their return in the first dependency case, the children "were in a toxic negative environment that continued until the second dependency was established, and that the children really, sadly, suffered from—at the very least, very serious unhealthy general neglect that was pervasive and really harmful to them in the long run." Although the court had no doubt that the parents loved the children, it concluded that adoption was the best

10

permanent plan for the minors because the parents "are not able to and have not met their physical and emotional needs really for a very long time." The court acknowledged that a plan of adoption was not without risk, especially for G.D., who was older. It opined, however, that if G.D. "isn't able to close one chapter and open another one, what we know is that he's not going to have a chance at all." The court thus expressly rejected the beneficial relationship exception to adoption as contrary to the children's needs. It then proceeded to find the minors adoptable, terminated parental rights, and selected adoption as the permanent plan. Father's timely appeal followed.

## DISCUSSION

### I. *Due Process Notice Challenge*

"[P]arents are entitled to due process notice of juvenile proceedings affecting their interest in custody of their children. [Citation.] And due process requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " (*In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418.) Father acknowledges that he was properly notified that the permanency planning hearing would take place on May 4, 2020. However, he argues that his due process rights were violated in this case because nothing in the record affirmatively shows that he was informed the hearing would be conducted by videoconference or that he was instructed regarding how to attend such a virtual hearing. We conclude that father has forfeited this claim by failing to raise it in the juvenile court.

"An appellate court ordinarily will not consider challenges based on procedural defects or erroneous rulings where an objection could have been but was not made in the trial court. [Citation.] Dependency cases are not exempt from this forfeiture doctrine. [Citations.] The purpose of the

11

forfeiture rule is to encourage parties to bring errors to the attention of the juvenile court so that they may be corrected." (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 754 (*Wilford J.*); see *In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) Moreover, the forfeiture rule has been applied specifically to claims of defective notice in dependency proceedings. (See, e.g., *In re B.G.* (1974) 11 Cal.3d 679, 689 [absence of notice of jurisdictional hearing in violation of mother's due process rights was forfeited on appeal where mother appeared with counsel at subsequent hearings and failed to raise the issue]; *Wilford J.*, at p. 754 [father forfeited claim of defective jurisdictional notice where he appeared at dispositional hearing with counsel and did not object]; *Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1149 [mother's failure to object to proceeding with dispositional hearing waived defective notice claim on appeal].)

Here, father routinely appeared with his attorney throughout the dependency proceedings, and he concedes that he received notice of the permanency planning hearing date. Although father was not present at that May 4 hearing, he was represented by counsel. Moreover, father's counsel had clearly been in touch with father in the days before the hearing, had formulated a strategy for the hearing with father, and expected father to call into the hearing. Indeed, father's email submission describing his beneficial relationship with his children was dated April 29, 2020, five days prior to the hearing. Father's counsel did not raise any defect in notice or seek a continuance of the hearing to allow father to be present. Instead, counsel sought admission of father's statement, which had been prepared as a substitute for father's live testimony and which urged the juvenile court to

12

forgo adoption on the basis of the beneficial relationship exception.  On this record, we conclude that father's claim of defective notice has been forfeited.

Anticipating this possible outcome, father asks us to exercise our discretion to reach the merits of his notice argument, even if we would otherwise deem it forfeited.  He asserts that the alleged error presents a pure legal question of constitutional dimension, an important legal issue, and a matter likely to recur.  It is true that forfeiture is not automatic, and appellate courts have discretion to excuse a party's failure to properly raise an issue in a timely fashion.  (*Wilford J.*, *supra*, 131 Cal.App.4th at p. 754.)  However, we decline to do so here.

"[I]n dependency proceedings, where the well-being of the child and the stability of placement is of paramount importance," an appellate court's discretion to excuse forfeiture " 'should be exercised rarely.' " (*Wilford J.*, *supra*, 131 Cal.App.4th at p. 754.)  Furthermore, "when a parent had the opportunity to present [a notice] issue to the juvenile court and failed to do so, appellate courts routinely refuse to exercise their limited discretion to consider the matter on appeal.  This is precisely because defective notice and the consequences flowing from it may easily be corrected if promptly raised in the juvenile court." (*Ibid.*)

This is just such a case.  Far from being a purely legal issue, whether father received sufficient notice of the permanency planning hearing is a factual question that has not been adequately developed in the record before us because the matter was never raised in the juvenile court.  The record does not disclose how the Department notified father that the hearing would be conducted by videoconference or otherwise supported his attendance.  What is clear is that father was aware the hearing was taking place on May 4, discussed his position with his attorney, and did not affirmatively state to

13

any party or the court that he had a problem with the virtual format. Indeed, inferences from the record support a contrary conclusion. Father's attorney, for example, expressed surprised when father did not call in, implying that they had discussed the matter. And father's own email stated that he and his girlfriend had been attending online 12-step meetings daily, suggesting competency with, and access to, virtual forums. Under these circumstances, we will not exercise our discretion to reach the merits of father's notice claim.

## II.    *Beneficial Relationship Exception*

"At a permanency planning hearing held in accordance with section 366.26, the juvenile court is charged with determining the most appropriate permanent plan of out-of-home care for a dependent child that has been unable to reunify. [Citation.] When reunification efforts with a parent fail, as they did in this case, the focus shifts from family preservation 'to the needs of the [children] for permanency and stability.' [Citations.] Thus, permanency planning hearings, as the name implies, are 'designed to protect children's "compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child." ' [Citation.] As the most permanent of the available options, adoption is the plan preferred by the Legislature. [Citation.] Indeed, when a court finds that a child is likely to be adopted if parental rights are terminated, it *must* select adoption as the permanent plan unless it finds a 'compelling reason for determining that termination would be detrimental to the child' due to one or more of the statutory circumstances delineated in section 366.26." (*In re Caden C.* (2019) 34 Cal.App.5th 87, 103, review granted July 24, 2019, S255839 (*Caden C.*).)

"These 'specified statutory circumstances—actually *exceptions* to the general rule that the court must choose adoption where possible—"must be

14

considered in view of the legislative preference for adoption when reunification efforts have failed." [Citation.] At this stage of the dependency proceedings, "it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home." [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption.' [Citation.] The statutory exception at issue in these proceedings—the beneficial relationship exception—applies where termination of parental rights would be detrimental to the child because the parent has 'maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*Caden C.*, *supra*, 34 Cal.App.5th at pp. 103–104.)

Under the beneficial relationship exception, the parent has the burden of proving (1) that the parent has maintained regular visitation, (2) that a beneficial relationship exists, and (3) that " 'the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." ' " (*Caden C.*, *supra*, 34 Cal.App.5th at p. 104.) Under the third prong, "the parent must establish that 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citation.] In evaluating this issue, the court must balance 'the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' " (*Id.* at p. 105, quoting *In re*

*Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Here, the juvenile court concluded that the children's need for an adoptive placement outweighed any relationship with the parents. We cannot say that it erred in making this determination.[3]

The record is replete with evidence of the significant abuse and neglect these siblings endured over the course of years, supporting the juvenile court's conclusion that the children were in a "toxic . . . environment" and suffered "very serious unhealthy general neglect that was pervasive and really harmful to them in the long run." Although the Department acknowledged the bond between father and his children, and the minors sometimes had loving and positive interactions with father during supervised visitation, father continued to struggle with significant problems that led to the minors' detention in the first place. As the Department points out, father refused to engage in parenting classes, did not stop using methamphetamine, declined the opportunity liberalize visits and spend more time with the children, never progressed beyond supervised visitation, and could not demonstrate that he had a safe, suitable, and habitable home for the minors. The juvenile court's observation that both parents here "are not able to and have not met their physical and emotional needs really for a very long time" finds ample support in the record. (See *In re K.P.* (2012) 203 Cal.App.4th

---

[3] This Division endorsed a hybrid standard of review for orders concerning the applicability of the beneficial relationship exception to termination of parental rights in which underlying factual determinations are reviewed for substantial evidence while the juvenile court's determination whether such a relationship provides a compelling justification for forgoing adoption is reviewed for abuse of discretion. (*Caden C., supra,* 34 Cal.App.5th at p. 106.) However, we recognize that appellate courts are divided on this question, and the matter is currently pending review in the California Supreme Court. (*Ibid.*) We would reach the same conclusion here under any articulated standard.

614, 621 ["No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life' " to satisfy the beneficial relationship exception].)

In contrast, the siblings were all placed together in the home of the SCP, fulfilling D.D.'s wish to be placed with her brothers. All three children were well cared for by the SCP and continued to receive mental health services to deal with the trauma they experienced while in their parents' care. Moreover, the children were comfortable in their caregivers' presence, viewed them as parental figures, were integrated into the current family system, and had a typical parent/child bond with the SCP. J.D. in particular has thrived in the ordered and structured environment of the SCP's home. And while G.D. has previously stated he did not want to be adopted, more recently he has been silent on the issue. The juvenile court appropriately considered the children's wishes in concluding that adoption was in their best interests. (See *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 955 [even when a child loves his or her parents and desires continued contact with them, the court may nonetheless terminate parental rights if doing so is in the child's best interests].) Similarly, the Department opined that any emotional bond the children had with their parents was not compelling enough to outweigh the benefits of adoption.

Finally, there was evidence that the continued uncertainty caused by the ongoing dependency proceedings was, itself, harmful to the children. The parents' lack of progress and inconsistent visitation was confusing and further traumatizing to them. Under the circumstances, we cannot fault the juvenile court for concluding that the children, especially G.D., needed to be able "to close one chapter and open another one" in order to have a chance to

17

be happy and healthy.  In short, we see no error in the juvenile court's rejection of the beneficial relationship exception and endorsement of a permanent plan of adoption for these young minors.

## DISPOSITION

The judgment is affirmed.

_____
Sanchez, J.

WE CONCUR:


_____
Margulies, Acting P. J.


_____
Banke, J.

*A160259  In re G.D.*

19