Filed 12/21/21  In re Caden C. CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re Caden C., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHRISTINE C., <br><br> Defendant and Appellant. | A162420 <br><br> (City and County of San Francisco Super. Ct. No. JD15-3034) |

This is the sixth time we have issued an opinion in these dependency proceedings involving young Caden C.  (See *In re Caden C.* (2019) 34 Cal.App.5th 87 (*Caden C. I*), revd. *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*); *In re Caden C.* (Dec. 9, 2020, A160213) (*Caden C. III*) [nonpub. opn.]; *C.C. v. Superior Court* (Sept. 10, 2020, A160270) (*C.C. II*) [nonpub. opn.]; *In re Caden C.* (May 22, 2020, A158063) (*Caden C. II*) [nonpub. opn.]; *C.C. v. Superior Court* (Aug. 28, 2017, A151400) (*C.C. I*) [nonpub. opn.].)[1]

---

[1] On our own motion, we take judicial notice of our prior opinions in this matter for relevant background.  (Evid. Code, §§ 452, subds. (c) & (d), 459, subd. (a); see *People v. Morris* (2015) 242 Cal.App.4th 94, 97, fn. 2.)

Our high court has also weighed in, issuing an opinion in May 2021 which analyzes the beneficial relationship exception to adoption in the context of this case. (*Caden C.*, at pp. 629–641.) In the meantime, Caden's dependency proceeded to a second permanency planning hearing at which the juvenile court found Caden adoptable, declined to apply the beneficial relationship exception to adoption, and terminated the parental rights of Christine C. (mother). On appeal, mother contends that the juvenile court committed reversible legal error in its rejection of the beneficial relationship exception. We disagree and affirm.

## I.  BACKGROUND

### A.    *Summary of Prior Proceedings*

A detailed history of these extended juvenile dependency proceedings can be found in our prior opinions in this matter, and we will not repeat it here. To summarize, during mother's 30-year history with the child welfare system, all six of her children have been removed from her care due to her chronic substance abuse, neglectful conduct, and involvement in domestic violence. (*Caden C. I*, *supra*, 34 Cal.App.5th at p. 92.) Caden, mother's youngest child, was initially removed in September 2013 at the age of four. (*Id.* at pp. 92–93.) After extended attempts at reunification, a permanency planning hearing was held for Caden in February 2018 pursuant to section 366.26 of the Welfare and Institutions Code.[2] The juvenile court found Caden adoptable but declined to terminate parental rights, citing the beneficial relationship between Caden and mother. Caden was placed in a permanent

---

[2] All section references are to the Welfare and Institutions Code unless otherwise specified.

2

plan of long-term foster care with his caregiver, Ms. H. (*Id.* at pp. 91, 102–103.)

In September 2018, the juvenile court held a six-month post-permanency review for Caden, maintaining him in long term foster care. In advance of the minor's March 2019 post-permanency review, the Agency recommended that a new section 366.26 hearing be set so that the juvenile court could again consider adoption by his then-caregiver Ms. H. as Caden's permanent plan. At the continued hearing on April 9, the court set the second permanency planning hearing for July 31, 2019.[3] Later that same day, we issued our opinion in *Caden C. I*, *supra*, 34 Cal.App.5th 87, reversing the juvenile court's reliance on the beneficial relationship exception to adoption in Caden's first permanency planning hearing.

On July 24, 2019, the Supreme Court granted review in *Caden C. I*. At the second permanency planning hearing on July 31, 2019, the juvenile court continued the permanency issue for a progress report in light of the Supreme Court's grant of review. However, it ordered a reduction in mother's visitation with Caden from monthly to once every other month due to her continuing destabilizing behaviors.[4] The permanency planning hearing was

---

[3] Mother filed a writ petition challenging this setting order, and we denied that petition on its merits in September 2020. (See *C. C. II*, *supra*, A160270.)

[4] The juvenile court found that contrary to the requirements of her visitation, mother regularly gave excessive and inappropriate gifts to Caden which caused conflict in the foster home. Mother also interfered in Caden's relationship with his therapist despite clear evidence the minor benefitted from the therapeutic relationship. When given the opportunity to attend one of Caden's soccer games, mother sent demanding and hostile text messages to Ms. H. so that all contact had to be stopped. Mother then attempted to reach Ms. H. directly by calling on a blocked number. Mother appealed from the court-ordered reduction in visitation, and in May 2020, we affirmed the juvenile court's order. (See *Caden C. II*, *supra*, A158063.)

then continued repeatedly without any finding of good cause or a determination that further delay was in Caden's best interests. (See *Caden C.* III, *supra*, A160213.) The juvenile court and parties apparently believed, incorrectly, that the second permanency planning hearing should not be held until the proceedings in the Supreme Court with respect to the first permanency planning hearing had been resolved. Given the length of time that passed while the second permanency planning hearing was pending, mother argued that a post-permanency review hearing under section 366.3 was required and must be held in its place. The juvenile court disagreed, reasoning that mother could present evidence in support of her interests at the upcoming permanency planning hearing. The court subsequently set a contested hearing over three dates in September and October 2020, granted mother's request for a bonding study, and denied her request for a stay of the pending permanency planning hearing.

Mother appealed from the court's failure to hold a post-permanency review hearing and in December 2020, we affirmed the juvenile court's order. (See *Caden C. III*, *supra*, A160213.) In doing so, we expressed concern over the significant delay in the case and its impact on Caden's need for permanency and stability. Given that almost three years had elapsed since the first permanency planning hearing, we determined that the scheduled permanency planning hearing should move forward as expeditiously as possible. To address mother's claims, we concluded that the section 366.3 hearing should trail the permanency planning hearing and any necessary findings be made if the court declined to terminate parental rights.

## B. *Events Since Our Last Opinion*

Ms. H. gave notice in July 2020 that she could no longer provide an adoptive home for Caden, and the Agency began looking for a new placement.

4

After three and a half years with Ms. H., Caden was moved to a new placement on November 10, 2020. Ms. H. requested the move for several reasons: the financial hardship her family was facing due to the pandemic; the stress caused by her separation from her partner; mother's referral of Ms. H. to the child abuse hotline for emotional abuse after Caden misplaced his iPad; and conflict between Caden and Ms. H.'s younger son, due, in part, to jealousy caused by mother's excessive gift giving.

The hotline call took place after mother's virtual visit with Caden in May 2020. Mother reported to the hotline that someone in the home had stolen Caden's iPad, which was untrue but led to a licensing investigation. As it turned out, Caden's iPad had slipped in between a desk and a couch. Ms. H. told the social worker that the incident "was the final straw in a long history of the mother constantly interfering with the placement and the rules of her home." While the decision to move Caden was incredibly difficult for Ms. H., she felt she could not commit to the permanency Caden deserves.[5] Given this development, both minor's counsel and the Agency requested that the contested hearing be continued so that Caden's situation could be clarified. The court set pre-trial motions on December 28 and continued the contested permanency planning hearing to three days in January 2021.

Caden's long-term therapist, Ms. Hirschfield, retired in July 2020 and Caden's new therapist, Ms. Sarria, worked with the minor to process the loss associated with leaving Ms. H.'s home. Ms. Sarria stated that while Caden was initially devastated by the move, he had transitioned smoothly, showed

---

[5] Mother filed a section 388 motion in September asserting that a permanency planning hearing was no longer appropriate because of Caden's pending placement with new caregivers. At a hearing on September 15, 2020, the juvenile court denied mother's modification request, stating that the issues raised by mother would all be addressed in the upcoming permanency planning hearing.

resilience in settling into the new placement, and appeared more relaxed since the move. The caregivers stated Caden was starting to open up and talk to them. They were working with him on vocalizing his needs and were supportive of him maintaining contact with his previous school community and Ms. H. Caden recently told the social worker that he liked the placement so far and felt he had more freedom and more responsibilities.

Caden was reported to be adjusting well to his new placement. He had made friends, enjoyed cooking dinner with his caregivers, was open to trying new things, had bonded with the family dog "Bear," and liked to ride his bike around his new neighborhood. He was participating in several outdoor camps during the winter break from school and would be visiting Ms. H. and her family. Caden was attending his old school virtually through the end of the school year. He was still working approximately three grade levels behind in most subjects, but his current caregivers were supporting him academically.

In advance of the December 28, 2020 hearing, the Agency filed a status review report on December 18 recommending placement of Caden in foster care with a goal of guardianship. The Agency reported that mother had provided the Agency with letters from her therapist and sign-in sheets for substance abuse groups. According to the therapist, " 'mother has been engaged in counseling for three years and . . . she has begun making intentional steps to curbing the intensity of her emotional reactions when events trigger anger.' " However, when mother spoke to the social worker about Caden's placement change in August 2020, she became upset, yelling and swearing. During the same conversation, mother admitted to drinking alcohol the previous week and using methamphetamine within the previous three or four months. The Agency continued to express concern that mother's

inability to follow basic visitation rules would negatively impact Caden's current placement, as it had previous placements.[6] For example, although the social worker had a clear conversation with mother about approved Christmas gifts prior to the November 2020 visit, mother ignored the conversation and brought extra gifts. The Agency concluded that Caden continued to benefit from reduced contact with mother because he was less dysregulated and disruptive in placement. Nevertheless, the Agency wanted Caden to stabilize in his placement before discussing permanency.

Caden's new court appointed special advocate (CASA) also filed a report in advance of the December 28, 2020 hearing. Per his CASA, Caden was enthusiastic, active, enjoyed participating in activities with others, and was eager to share his knowledge. He demonstrated impressive physicality. During a visit after Caden was told he would be moving from Ms. H.'s home, the minor expressed sadness and anger and was otherwise quiet, showing no interest in anything. However, the CASA was "pleasantly surprised" at the minor's resilience on her first visit to his new home. Caden appeared very relaxed and interactive. He was excited to share that he already knew how to get to the local park and that he was getting a weekly allowance, with possible extra money for doing chores. Caden was the only child in the home and had his own room. The current caregiver seemed to be taking a great interest in the minor's well-being. The CASA summarized Caden's new

---

[6] As we detailed in *Caden C. I*, mother's poor boundaries and impulsive behaviors led to the failure of a previous placement with Ms. H. in 2016. Caden lost two other potentially permanent placements in February 2017 and May 2017 due to mother's disruptive conduct. (*Caden C. I*, *supra*, 34 Cal.App.5th at pp. 96–98.) Although Ms. H. then agreed to take the minor back, Caden's long-term placement with Ms. H. was disrupted once again by mother as discussed above.

placement as "stimulating, supportive, safe, and enjoyable" for the minor. Caden expressed to his CASA that he wanted to stay in contact with Ms. H.

According to the CASA, Caden's teachers described him as calm and laid back, with no disciplinary issues. Caden was not participating in his sports teams due to the COVID-19 pandemic, and he missed his teammates and playing sports. However, his current caretakers had taken him skiing and were planning to teach him to snowboard. The minor was very healthy. The CASA reported that Caden was "passionate about the things he loves . . . curious, aware of his environment, and like[d] exploring." He asked her questions ranging from " 'where did rap music come from?' " to " 'how does somebody get into a place like [UC Berkeley]?' " In sum, she enjoyed spending time with him.

At the December 28 hearing, minor's counsel objected to the Agency's recommendation that the minor remain in foster care rather than proceed to a permanency planning hearing. Caden's caregivers had informed counsel the previous day that they were willing to provide permanency for Caden, either through adoption or, failing that, guardianship. The Agency indicated that it would need to follow up with the caregivers and provide any more recent information to the court. Mother's counsel then requested a continuance, but the juvenile court stated it would only entertain such a request by written motion. The court maintained the January 2021 dates for the contested permanency planning hearing.[7]

On January 5, 2021, the Agency filed an updated assessment report, indicating that it was recommending adoption and termination of parental rights. Although Caden had only been living in his new placement for a short

---

[7] Mother filed a motion for continuance of the permanency planning hearing on January 4, which—after opposition from the Agency and minor's counsel—was denied by the juvenile court as not in Caden's best interests.

time, his caregivers were open to permanency, including adoption, and stated they wanted what was in the minor's best interests. They expressed joy regarding Caden being a part of their family and lives. The caregivers had successfully fostered a handful of children over the previous few years and had expressed the hope of providing permanency for a child in post-permanency status if the opportunity arose. There appeared to be no impediments to adoption. Caden told the social worker that he felt safe and comfortable in the placement and wanted to remain there. The social worker, however, had not explicitly discussed a plan of adoption with the minor, hoping to give the relationship time to progress naturally without forcing Caden to choose between his conflicting feelings regarding missing his mother and forming an attachment with a family who could provide him with permanence.

With respect to visitation, the Agency reported that mother's inability to comply with set rules and court-ordered expectations had not changed. The Agency remained concerned that mother "consistently projects her dissatisfaction onto Caden instead of listening to what he thinks and feels." She also places guilt on the minor for becoming comfortable in a placement. At the virtual visit in March 2020, for example, mother asked several times whether Caden was okay—stating that he looked "miserable and unhappy"—despite the fact that the minor continued to assure mother he was fine. At the end of the visit, mother stated: " 'I know something is wrong and you just don't want to say it.' " Caden ignored the comment. At the May 2020 virtual visit, the social worker had to intervene and remind mother not to discuss the case. Mother became angry and cried several times during the visit, escalating when Caden mentioned his iPad was missing. Mother promised

Caden she would get to the bottom of the issue, crying and yelling that "Caden deserved everything good in the world."

## C. *The Second Permanency Planning Hearing*

### *i. Motion to Quash Minor's Testimony*

Caden's second permanency planning hearing was held over four days in January 2021.[8] At the beginning of the hearing on January 11, 2021, the juvenile court considered minor's motion to quash mother's subpoena of Caden's testimony. Minor's counsel argued that Caden's wishes could be presented by other means and that testifying would be traumatizing for the minor and could undermine his nascent stability in his current placement. Counsel further asserted that it would place Caden in the "psychologically untenable" position of choosing between his desire for a permanent, stable home and his loyalty to mother. In addition, Caden had informed his attorney that he did not want to testify, even if it was done virtually or in chambers. Mother opposed the motion to quash. Mother's counsel argued that Caden's firsthand testimony was needed because the reports variously indicated that Caden did not want to discuss adoption, that it was difficult for him to discuss it, or that he had conflicting feelings or contrary messages. During this exchange, Caden became very emotional and began to cry. He stated: "I wanted to say that I don't talk about it because every single thing I say to you guys, you guys never consider it." Relying on *In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1088–1089, the juvenile court found that it would be harmful to Caden to require his testimony and that his feelings were expressed well in Agency reports. The court assured Caden that it had been

---

[8] Caden was present via videoconference for the first day of the hearing, the morning of the second day, and for argument and decision, but otherwise did not attend. Mother appeared via the video platform for most of the hearing.

reading the reports and what the minor had indicated, and while it could not promise what it was going to do, the court heard him.

*ii.    Testimony of Social Worker*

The social worker Elizabeth Short testified that she had been assigned to Caden's case since April 2019.  She described Caden as a "really funny" and "really engaging" 11-and-a-half-year-old boy with a wide variety of hobbies.  Although she thought she knew what he looked like when relaxed, she was seeing something different since the minor moved to his new placement.  Caden was smiling a lot more and just seemed more comfortable. He was trying many new things, including new foods, and was very positive about it.  He was taking bass guitar lessons arranged by his CASA.  And he had done a wilderness skills camp over school break which he "really, really liked."  The caregivers worked remotely, and they took turns supporting Caden's distance learning.  According to the social worker, there was a level of joking and camaraderie around the placement that was unusual so soon after a move.  She noted in this regard that Caden told her he didn't know people bought cheese in blocks instead of pre-shredded in bags and asked her if she knew anyone who shredded their own cheese.  Caden was observed laughing at this testimony.  The foster parents had "nothing but lovely things" to say about Caden and his adjustment.  They kept him connected to his former community in Novato.  He had slumber parties with his friends and communication with Ms. H.[9]

---

[9] In a recorded sidebar, Agency counsel informed the juvenile court that, during a break in the social worker's testimony, mother had made inappropriate threats through the video platform that she would find the caregivers, which were heard by Caden, the caregivers, and the CASA. Specifically the caregivers heard mother state, " 'We are going to expletive find you,' " while the CASA heard:  " 'Don't worry.  I believe we will find you.' "  In addition, both the court and the social worker had observed mother

Ms. H. had informed the social worker that there was a time, early in Caden's case, when she and mother had an "okay relationship," but it deteriorated over the years with mother's communications often devolving into harassment. Both Ms. H. and Caden's former therapist told the social worker they saw positive changes in Caden after his visitation with mother was reduced to once every other month. The minor was less irritable, he exhibited less dysregulation in his mood, there was less arguing in the foster home, and Caden was able to follow the home rules.

Ms. Short testified that mother was generally consistent with visitation, and Caden looked forward to seeing her. However, when mother discussed the case with Caden during visits, it affected him negatively and she communicated inaccurate information, which led Caden not to trust what the social workers told him. For example, mother told Caden that his dependency case was all his attorney's fault—that counsel had some sort of vendetta against mother—which Caden continued to believe, and which negatively impacted his ability to trust his attorney and other adults. At one point, Caden asked the social worker why he had been removed, stating that he had never seen mother use drugs and that she told him that she did not use them. During the May 2020 virtual visit, mother brought up the case, making statements such as "this isn't Caden's fault" and " 'they just didn't want me to have you.' " When mother became upset and began to cry and yell, Caden was "visibly bothered" by her behavior. Ms. H. reported that,

_____

frequently mouthing things during the hearing while muted, which at times appeared to be directed communications. The court admonished mother not to make any further improper communications on the video platform, whether they be threatening or in anger or by mouthing. Mother, however, was unable to refrain from moving about, mouthing, and yelling while on mute.

after the visit, Caden went straight to his room, put his head under the pillow, and didn't want to talk about what happened.

The social worker opined that, if parental rights were terminated, it would be a good thing for Caden to have some contact with his mother throughout his teen years in a controlled, supervised setting. She testified that, according to a May 2018 contact note in the case file, Caden had reportedly scratched himself at that time because he missed mother. Ms. Short also testified that it had been very difficult for Caden to deal with multiple transitions between different foster families. As he has gotten older, Caden has felt ambivalent about his situation because he likes living in a safe and stable home, but he also likes having a relationship with mother. She stated the Agency's view "that a stable and predictable caregiver is what can help guide Caden through the difficulties that he has experienced and witnessed while in [mother's] care and that that can be one of the things that would really help him through, especially through his teenage years, to be able to self-regulate better, to help heal his mental health, and kind of stabilize some of these issues that came up while he was in [mother's] care." Finally, when asked to summarize her experience with mother, the social worker said "unpredictable."

### iii. *Mother's Bonding Expert*

Mother's bonding expert, Dr. Molesworth, submitted an updated bonding study during the contested permanency planning hearing.[10] Dr. Molesworth observed Caden and mother for two hours in July 2020 and two hours in October 2020. He interviewed Caden alone on both of those occasions. He also interviewed mother on January 17, 2021. After the July

---

[10] His prior bonding study is summarized in our prior published opinion in this matter. (See *Caden I*, *supra*, 34 Cal.App.5th at pp. 101–102.)

13

visit, Caden told Dr. Molesworth that he missed mother every day and wished he could see her every day. On a scale of 1 to 100, he missed mother 100. If he did not live with Ms. H., he would also miss her 100. He would like to live with mother and Ms. H. on alternating weeks. After the visit in October 2020, Caden acknowledged that he sometimes thought about other things and did not miss mother, but stated he missed her 99 out of 100. He told Dr. Molesworth he was happy living with Ms. H. but would like to see mother more—two to three hours or a whole day. Caden elaborated: "[W]hen I grow up, I want to see [mother] a lot, I want to keep in touch with all my family including [Ms. H.]. I want to invite them to dinner and go to a movie. I don't want to be one of those people who does not have their family." (Italics omitted.)

Mr. Molesworth opined that Caden continued to have a significant, positive bond with mother. Although their interactions were less exuberant than three years ago, Dr. Molesworth felt this could be due to Caden's developmental stage. Caden, however, also reported strong feelings for Ms. H., whom he stated he loved like a mom. According to Dr. Molesworth, Caden's emotions and thinking regarding his bond with mother had evolved since his last evaluation. There was evidence of some nuance and flexibility in his thinking, as mother is no longer the sole focus of his emotional life. Rather, his "affectionate emotions" towards Ms. H. revealed that Caden can have "strong feelings towards other significant emotional figures in his life."

Nevertheless, Dr. Molesworth opined that if Caden were deprived of contact with mother it would be a major loss. He would experience emotional distress and pain, and it would likely have a negative effect on his self-regard. Dr. Molesworth acknowledged that, while initially devastated by his removal from Ms. H., Caden adjusted well to his new home. He opined,

14

however, that the loss of mother would be on a different order. Mother represented an "affectionate and loving maternal figure" for Caden. She is a repository of "aspects of his history and life experiences, the one person who has been a fixture in his life." The loss of his mother would be "likely to contribute to depression and chronic stress and have an enduring impact on his psychology."

Dr. Molesworth reported that, although guardianship would allow a parent to petition for reunification in the future, mother had stated to him that she did not intend to do so. He acknowledged that a guardianship could be negatively impacted should mother create disruptions by intruding into the parenting of the legal guardians. Mother's unsolicited intrusions, even if well-intentioned, could be confusing for Caden. In addition, Caden's special needs render him vulnerable to emotional regression during periods of increased stress. However, "his special needs may be addressed, and his emotional vulnerabilities buffered, by adults who are attuned and responsive to his needs."

Dr. Molesworth testified at the contested hearing as mother's only witness. He qualified by stipulation as an expert in the areas of child psychology and child development, bonding and attachment, bonding study evaluations, and forensic psychology. He had completed seven bonding studies in dependency cases in the last four years. He did not do any collateral interviews with the social worker or Caden's current therapist for his 2021 evaluation.

Dr. Molesworth testified regarding the contents of both his 2017 and 2021 bonding studies. He elaborated that the depressive features associated with Caden's loss of mother could possibly include episodes of depressed mood, self-harm, substance abuse, and acting out behaviors. He described

Caden as "a fairly expressive guy" who could "talk about his feeling quite readily" and was "easy to have a conversation with." He also reiterated that there could be a "disruptive influence" by mother in the context of a legal guardianship.

### iv. Agency Expert

The Agency's expert, Dr. Alicia Lieberman, submitted an updated clinical consultation report during the contested permanency planning hearing.[11] She had consulted on Caden's case since 2016. Her report, dated January 22, 2021, discussed some of the limitations of Dr. Molesworth's updated bonding study. For example, the bonding study focused on the "affectional bond" between Caden and mother, which had never been disputed. It failed, however, to consider the extensive evidence of dysregulation and disruptive behavior associated with Caden's visits with mother. In addition, the bonding study did not address mother's behaviors that were detrimental to the minor's mental health, such as mother's repeated disruption of his placements, undermining of Caden's relationships with his foster parents, displays of crying and anger during visits, and refusal to abide by the visitation rules with resulting conflict. This conduct placed an emotional burden on the minor, whose attachment to his mother is characterized by intense worry about her well-being. It caused Caden to adopt a "caretaking role that he is too young to uphold without serious detriment to his healthy development."

Mother's persistent interference over the years had caused Caden to lose "important opportunities to maintain stable relationships with adults who were invested in his wellbeing and willing to provide a permanent home

---

[11] Her prior clinical consultation report is summarized in our prior published opinion in this matter. (See *Caden I*, *supra*, 34 Cal.App.5th at pp. 100–101.)

to him." There was a high risk this behavior would continue in Caden's current placement. Because of this, placement decisions other than adoption, such as legal guardianship, posed "unacceptable risks for Caden's wellbeing." Dr. Lieberman cautioned this would be "the last chance that Caden has for placement stability and the benefits that it will provide for his healthier development as an adolescent and into adulthood."

The adoption recommendation was made after a careful weighing of the risks and benefits. According to Dr. Lieberman, continued placement instability as Caden makes the challenging transition into adolescence represents "a clear danger to this child's ability to acquire emotional stability as an adult." Dr. Lieberman acknowledged that termination of parental rights and adoption would "present emotional challenges for Caden." However, they would "also free him to process the separation from his mother, to focus on deepening his relationships with the new parent figures, and to plan for how he wants to re-establish a connection with his mother when he is able to do so from a more autonomous developmental stage." In sum, giving Caden the experiences of "a solid home with predictable relationships and healthy, growth-promoting routines has been the least detrimental course of action for him for many years."

Dr. Lieberman testified as a rebuttal witness at the contested hearing. She was accepted as an expert in parent-child bonding and attachment with a specific focus on childhood trauma and its impact on children. She did not perform a bonding study and did not speak with or observe mother and Caden. Instead, she provided a clinical consultation after reviewing the breadth of data. Specifically, she reviewed the entire child welfare file, met with different participants in the case, had a long conversation with Caden's initial therapist, spoke with Ms. H., and took part in numerous meetings

17

with the different service providers involved with Caden over the course of years.

Dr. Lieberman testified that when his visits with mother were reduced from weekly to monthly, a part of Caden was sad and upset but he did not have a decline in performance at school and his behavior in the home was more stable. When visits were reduced to every other month, Caden was upset and emotional, but he worked through it with Ms. H. and the social worker, recovered very well, and his behavior afterwards actually stabilized. Dr. Lieberman further testified that not being able to see his mother as much as he would like was "a manageable stress" for Caden. Just because a child has vulnerabilities doesn't mean that any particular stress is worse than other kinds of stress. Separating a child from a parent when that child experienced physical or emotional abuse or neglect under that parent's care can actually be a therapeutic intervention. Such a child might have a connection with that parent that has loving components but that also has components of fear and anger.

v.    *Argument and Decision*

Minor's counsel and Agency counsel both argued in favor of termination of parental rights and a permanent plan of adoption. In making his remarks, minor's counsel expressed sadness that "once again [a] hearing [t]hat is supposed to be about Caden has turned out to be a hearing about his mother." In contrast, mother's attorney argued that Caden was not generally adoptable and that there was insufficient evidence he was specifically adoptable by his current caregivers, making termination of parental rights improper. Moreover, even if the court found Caden adoptable, mother's counsel contended that termination of parental rights was still inappropriate due to the existence of a beneficial relationship between Caden and mother.

18

The juvenile court announced its decision on February 2, 2021. It first found Caden to be generally adoptable by clear and convincing evidence. The court then considered application of the beneficial relationship exception to the case. It found regular visitation by mother to the extent permitted by court order. It next turned to the question of "whether the nature and extent of a particular parent-child relationship is sufficient to be deemed beneficial for purposes of the exception." The court found that there was an emotional bond between Caden and mother. It stated, however, that in determining whether a relationship is beneficial "you have to look at all of the different factors, including all the unique factors in this case."

The court considered the entire history in the matter and concluded that mother's relationship with Caden was not beneficial because it was not a positive, parental relationship. Rather than being nurturing, it was disruptive and deprived him of stability and permanence with different caregivers. The court assured Caden that it had read and heard everything Caden had said, and it had also considered the minor's need for safe and predictable caregiving given his history. The court finally determined that the benefit of an adoptive home for Caden outweighed "any benefit that could have arisen" from his relationship with mother. This timely appeal followed.

## II. DISCUSSION

### A. *The Supreme Court's* Caden C. *Decision*

Several months after the second permanency planning hearing in this matter, our high court issued its opinion in *Caden C.*, *supra*, 11 Cal.5th 614. The Supreme Court recognized that the juvenile court's February 2021 termination of mother's parental rights rendered the case moot. (*Id.* at p. 629, fn. 3.) However, noting that the beneficial relationship exception "is of great importance and one of the most litigated issues in dependency

19

proceedings," and that the questions presented might otherwise evade review, the court decided to retain and decide the matter. (*Ibid.*) Specifically, the Supreme Court granted review to clarify the applicability of the beneficial relationship exception—especially "whether a parent must show progress in addressing issues such as drug abuse that led to the child's dependency in order to establish the exception"—and to resolve a conflict in the appellate courts regarding the appropriate standard of review for decisions involving the exception. (*Id.* at p. 629.)

The beneficial relationship exception is "limited in scope." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) As our high court summarized, the exception "requires a parent to establish, by a preponderance of the evidence, . . . that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Id.* at p. 629; see also § 366.26, subd. (c)(1)(B)(i).) In other words, to take advantage of the exception, a parent must prove: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.,* at p. 631.) The Supreme Court noted that, pursuant to relevant statutory provisions, when a juvenile court determines that the beneficial relationship exception applies, it is tantamount to concluding that "adoption or termination is not 'in the best interest of the child.'" (*Ibid.*, quoting § 366.36, subd. (c)(4)(A).) The Court then addressed each element of the beneficial relationship exception in turn.

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632, quoting *In re I.R.* (2014) 226 Cal.App.4th 201, 212.) Visits and contact

are important in this context because they can " 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.' " (*Ibid.*, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)  We review a juvenile court's finding with respect to regular visitation and contact for substantial evidence. (*Id.* at p. 639.)  The Agency concedes in this appeal that mother has satisfied the first element.

"As to the second element, courts assess whether "the *child* would benefit from continuing the relationship," and thus the focus is on the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 632, quoting § 366.26, subd. (c)(1)(B)(i), italics added.)  In determining whether the relationship is beneficial—that is, "strong, positive, and affirming" for the child (*id.* at p. 634)—juvenile courts may consider "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)  In addition, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)  A parent's struggles, such as those that led to the dependency, "speak to the benefit (or lack thereof) of continuing the relationship and are relevant to that extent." (*Id.* at p. 638.)  Such continuing struggles "may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Id.* at p. 637, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Courts must be mindful, however, that parent-child relationships do not necessarily conform to a particular pattern. (*Caden C.*, *supra*, 11 Cal.5th at p. 632; [" 'parenting styles and relationships differ greatly between families' "].)  Moreover, "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of

21

"comfort, nourishment or physical care" ' " that a parent provides during visitation.  (*Ibid.*, quoting *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1538 (*Brandon C.*).)  Finally, the Supreme Court recognized that "sometimes . . . a relationship involves tangled benefits and burdens."  (*Id.* at p. 634.)  It emphasized that information from expert psychologists who have either observed the child and parent or can synthesize others' observations is important when determining the psychological importance of the relationship to the child.  (*Id.* at pp. 632–633 & fn. 4.)  A juvenile court's finding with respect to the existence of a beneficial relationship is "essentially a factual determination" and is also reviewed for substantial evidence.  (*Id.* at p. 640.)

In addressing the third element—whether termination of the parental relationship would be detrimental—our high court was guided by the seminal decision interpreting the beneficial relationship exception, *Autumn H.*, *supra*, 27 Cal.App.4th 567.  *Autumn H.* held that, in assessing detriment, the juvenile court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."  (*Caden C.*, *supra*, 11 Cal.5th at pp. 631–632, citing *Autumn H.*, at p. 575.)  "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship."  (*Id.* at p. 633.)  Thus, the question for the juvenile court is "what life would be like for the child in an adoptive home without the parent in the child's life."  (*Ibid.*)  In this context, "the court acts in the child's best interest in a specific way:  it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' "  (*Ibid.*, quoting *Autumn H.*, at p. 575.)

Under this analysis, termination may be detrimental "[e]ven where it may never make sense to permit the child to live with the parent." (*Caden C., supra*, 11 Cal.5th at p. 634.) Thus, the permanency planning hearing "is decidedly not a contest of who would be the better custodial caregiver." (*Ibid.*) Rather, "understanding the harm associated with severing the relationship is a subtle enterprise—sometimes depending on more than just how beneficial the relationship is." (*Ibid.*) When a parent-child relationship "involves tangled benefits and burdens," the juvenile court "faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Ibid.*) Under such circumstances, a court could find that "terminating a relationship with negative aspects would have some positive effects that weigh in the balance—and may tip it in favor of severing the parental relationship to make way for adoption." (*Id.* at p. 635.)

When reviewing the juvenile court's conclusion with respect to this third element, underlying factual findings—regarding, for example, specific features of the child's relationship with the parent, the harm or benefit related to the child's loss of those features, how harmful the total loss would be, and how an adoptive placement may offset or even counterbalance those harms—are reviewed for substantial evidence. (*Caden C., supra*, 11 Cal.5th at p. 640.) However, the juvenile court's ultimate determination of detriment—which weighs the harm of losing the parental relationship against the benefits of placement in an adoptive home—requires the court to "engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain" and is thus properly reviewed for abuse of discretion. (*Ibid.*) The Supreme Court acknowledged that where, as here, "the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no

practical difference in application of [the substantial evidence and abuse of discretion standards of review].'" (*Id.* at p. 641.)  Thus, the hybrid standard endorsed by our high court embodies "the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Ibid.*, quoting *In re Zeth S.* (2003) 31 Cal.4th 396, 410.)

## B.      *The Juvenile Court did not Commit Legal Error in Finding no Beneficial Relationship in This Case*

At a permanency planning hearing held in accordance with section 366.26, the juvenile court is charged with determining the most appropriate permanent plan of out-of-home care for a dependent child that has been unable to reunify.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50, disapproved of on other grounds in *Caden C.* at p. 636, fn. 5.)  When reunification efforts with a parent fail, as they did in this case, the focus shifts from family preservation "to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  As the most permanent of the available options, adoption is the plan preferred by the Legislature.  (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 573.)  Indeed, when a court finds that a child is likely to be adopted if parental rights are terminated, it *must* select adoption as the permanent plan unless a parent shows that termination of parental rights would be detrimental to the child due to one or more of the statutory circumstances delineated in section 366.26.  (§ 366.26, subd. (c)(1)(B); *Caden C.*, *supra*, 11 Cal.5th at pp. 630–631.)  At issue in this appeal is the beneficial relationship exception to adoption set forth in section 366.26, subdivision (c)(1)(B)(i).

24

At the 2021 permanency planning hearing in this matter, the juvenile court found Caden to be generally adoptable, and mother does not challenge this determination on appeal. Thus, the juvenile court was statutorily required to terminate mother's parental rights absent proof by mother of a beneficial relationship. On appeal, mother does not suggest that substantial evidence fails to support the juvenile court's factual finding that no beneficial relationship existed. Instead, she raises a legal challenge, claiming that the juvenile court erred by requiring mother to show that she occupied a "parental role" during her visitation with Caden, an improper factor under the beneficial relationship exception as recently elucidated by *Caden C.* We are not persuaded.

Mother focuses on a single statement made by the juvenile court in rendering its decision. The court stated at one point with respect to the beneficial relationship exception that "you have to look at all the different factors, including all of the unique factors in this case, but what it speaks to is that the benefit necessarily talks about a parental relationship. It talks about that that particular ongoing contact, which was limited in this case by the court order, is such that it would create a parental role in Caden's visitation. [¶] And I can't find that here."

Mother acknowledges that the beneficial parent-child relationship involves "a significant, positive, emotional attachment from child to parent" the severance of which would cause great harm to the child. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) She asserts that requiring a parent to demonstrate that they occupy a "parental role" during visitation is not an element of the beneficial relationship to adoption, and therefore amounted to legal error. In making this claim, she relies on many of the same cases the Supreme Court cited with approval in *Caden C.* Mother argues that "it is not

25

necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" ' " that a parent provides during visitation. (*Caden C*, *supra*, 11 Cal.5th at p. 632, quoting *Brandon C.*, *supra*, 71 Cal.App.4th at p. 1538.) She emphasizes that parental relationships do not necessarily conform to a particular pattern. (*Ibid.,* citing *In re Grace P.* (2017) 8 Cal.App.5th 605, 614–615; *In re S.B.* (2008) 164 Cal.App.4th 289, 299 (*S.B.*); *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, disapproved of on other grounds in *Caden C.* at p. 636, fn. 5.) And she points out that the beneficial relationship exception does not require a showing of "day-to-day contact" between the parent and child or the existence of a "primary attachment." (See *S.B.*, at pp. 299–301.)

We do not disagree with any of the foregoing legal points. However, we cannot conclude that the juvenile court's comment about a "parental role" suggests that the court was requiring mother to demonstrate "some idealized version of what a parent-child relationship should look like." Rather, when the juvenile court's statement is viewed in the context of its overall remarks and the record as a whole, it is clear the court was explaining that Caden did not enjoy a *positive* and nurturing emotional attachment to mother because of mother's disruptive and destabilizing behaviors and their negative impact on the minor.

When the juvenile court addressed the first element of the beneficial relationship exception—regular visitation and contact—the court explained that this element "is a purely quantitative analysis, and it is limited to the extent permitted by court orders . . . ." The court did not suggest that it viewed visitation through the litmus test of a parental role, and it readily found that mother had satisfied the first element of the exception.

26

In discussing the second element, whether the parent-child relationship is beneficial to the minor, the court explained that "[you] have to look at that and see if that continuing contact then results in a benefit to Caden and whether the nature and extent of a particular parent-child relationship is sufficient to be deemed beneficial for purposes of the exception." That is a correct statement of the law. (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 [beneficial relationship exception "applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent"]; see also *Caden C.*, *supra*, 11 Cal.5th at p. 632, quoting *Autumn H.*)

After noting that the inquiry required looking at "all of the different factors," the court made the statement about mother playing a parental role during visitation which she claims was legal error. The court, however, went on to explain: "[A]nd the reason I can't find that here is that all of the readings that I have, the visitation, et cetera, goes to the disruption of that goal rather than an encouragement of it." The court was plainly focused on mother's disruptive behaviors—whether in visitation or in her interactions with Caden, foster families, therapists, and others—and the negative and destabilizing effect those interactions had on Caden. The court expressly noted that Caden had not been the cause of the disruptions in his foster placements. Later in the hearing, the court stated: "[T]he foster parents have also expressed a concern about the involvement of [] mother and ongoing visitation contact with Caden as being the primary reasons for the child not being able to connect and settle into a permanent home, and so the very thing that I have found in regards to regular visitation was the very means upon which that permanency had been in some manner undermined."

In discussing Dr. Molesworth's bonding study, the court remarked that Dr. Molesworth talked about "emotional contact" between mother and Caden, but his study did not talk about a "parental role," meaning that the relationship between Caden and mother was not "*a parental one, a nurturing one.*" (Italics added.) Thus, the court's comments about a parental role in this case reflected a determination that mother's regular visitation and contact with Caden did not result in a positive and nurturing attachment, *i.e.*, that it was not a beneficial relationship for the minor.

At oral argument in this matter, mother's counsel suggested that insufficient evidence supported this determination, or at least that the evidence in support of the court's finding was stale. The record clearly belies this claim. Mother's negative behaviors have included her disruption of multiple foster placements by making unwarranted reports and interfering with the foster parents' caregiving practices and routines, undermining Caden's relationship with the foster parents, exposing Caden to displays of anger and crying during visits, making Caden feel guilty for becoming comfortable in a foster home, discussing the case at visitation and conveying inaccurate or misleading information, and refusing to abide by visitation guidelines, causing conflict within the foster family households. The record is replete with instances in which Caden became dysregulated and emotionally distraught by these interactions, grew distrustful of adults around him, and was deprived of an opportunity to develop stable and nurturing relationships in other foster households. Mother's disruptive behaviors extended well into 2020 and beyond, with a May 2020 virtual visit that degenerated into mother crying and yelling, mother's referral of Ms. H. to a child abuse hotline over a misplaced iPad that contributed to Caden's loss of adoptive placement with Ms. H. in July, a November 2020 virtual visit in which mother once again

ignored gift-limitation rules, and mother having to be admonished by the juvenile court about inappropriate comments and gestures at the permanency planning hearing in January 2021.

We find the recent cases cited by mother to be distinguishable. (See *In re D.M.* (2021) 71 Cal.App.5th 261 (*D.M.*); *In re J.D.* (2021) 70 Cal.App.5th 833 (*J.D.*); *In re B.D.* (2021) 66 Cal.App.5th 1218 (*B.D.*).) In *B.D.*, the juvenile court rejected the beneficial relationship exception to adoption by "rel[ying] heavily, if not exclusively, on the fact that the parents had not completed their reunification plans and were unable to care for the children based on their long-term and continued substance abuse. The juvenile court, however, did not examine how the parents' continued substance abuse impacted the nature of the parent-child relationship." (*B.D.*, at p. 1228.) This was contrary to the Supreme Court's discussion of the beneficial relationship exception in *Caden C.* (See *Caden C.*, at p. 638 [a parent's struggles are only relevant to the extent they "speak to the benefit (or lack thereof) of continuing the relationship"]; *id.* at p. 634 [termination of parental rights may be detrimental "[e]ven where it may never make sense to permit the child to live with the parent"].)

The appellate court in *B.D.* also concluded that it was not clear from the record whether the juvenile court had properly examined "the nature of the parent-child relationship" and "whether a significant positive emotional attachment existed between the parents and children." (*B.D., supra*, 66 Cal.App.5th at p. 1228.) Finally, the social worker testified in *B.D.* that she believed the beneficial relationship exception did not apply due to the parents' "inability to attend to the children's day-to-day needs" and the fact that "the children looked to their grandmother to meet their daily needs." (*Id.* at p. 1229.) Thus, the social worker improperly "equated a parental

role . . . with the ability to parent 'on a fulltime basis' " and erred in concluding that the child's attachment to the parent must be the primary attachment. (*Id.* at pp. 1229–1230.) Under these circumstances, the appellate court reversed the order terminating parent rights and remanded the matter for reconsideration "based on a proper application of governing law." (*Id.* at p. 1222.)

Here, in contrast, the juvenile court did not consider mother's completion of services or her ability to parent on a full-time basis. Instead, as discussed above, it focused on her disruptive behaviors and how they negatively impacted Caden, an approach expressly endorsed by the Supreme Court in *Caden C.* Unlike *B.D.*, there is ample evidence in the record concerning the nature of the parent-child relationship here, including years of social worker reports and four reports by experts.

Finally, while the social worker in *B.D.* improperly equated "parental role" with primary attachment and ability to parent full-time, in this case the juvenile court concluded that mother's contact with Caden was not "parental" because it was not positive—i.e., stabilizing and nurturing. The *B.D.* court, itself, recognized that "[a] positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability." (*B.D., supra*, 66 Cal.App.5th at p. 1230.) That is exactly the inquiry the juvenile court undertook here.

Mother's reliance on *J.D.* is similarly misplaced. Our colleagues in Division Two of this District reversed a termination of parental rights because it could not determine on the record before it whether the juvenile court's ruling complied with the principles announced by the Supreme Court in *Caden C.* while the matter was on appeal. (*J.D., supra*, 70 Cal.App.5th at

p. 840.) In terminating parental rights, the juvenile court made "few explicit factual findings." (*Id.* at p. 851.) "It acknowledged J.D. has a relationship with [the] mother and that it is a positive one. But it found their relationship did not 'amount to [a] parental bond' and that 'severing the relationship that does exist would not be so detrimental as to outweigh permanency for [J.D.]' " (*Ibid.*)

The *J.D.* court expressed concern about the lack of objective information in the record regarding the quality of the mother's relationship with J.D. (*J.D.*, *supra*, 70 Cal.App.5th at p. 861.) The appellate court observed that "by the time the juvenile court scheduled the section 366.26 hearing, the agency's prior reports should already have provided objective, disinterested information about the quality of J.D.'s attachment to his mother, which would have assisted the court in evaluating the beneficial relationship exception when [the] mother asserted it." (*Ibid.*) They did not. (*Id.* at p. 860; see *id.* at p. 862 [noting that there was no bonding study or other expert opinion in the case].) Finally, the social worker in *J.D.* opined, that the mother did not prove a beneficial relationship because "J.D. looked to [his caregiver], not mother, for comfort, support, structure and to meet his needs," and had previously said that he wanted " 'to be [the caregiver's] son.' " (*Id.* at p. 859.) As the appellate court recognized: "A child's emotional attachments are not a zero-sum game." Thus, "such evidence does not preclude a finding [J.D.] had a significant positive attachment to mother." (*Ibid.*)

Given the conclusory nature of the juvenile court's findings on the second element, the appellate court noted that the juvenile court's reference to "parental" role might have encompassed factors that *Caden C.* deems irrelevant," such as failing to comprehend "that more than one person can

31

occupy an important, emotional role for a child even if one—the nonreunifying parent—is incapable of providing for the child's everyday needs and well-being." (*Id.* at pp. 864–865.)  For all these reasons, the *J.D.* court deemed it "prudent" to remand the matter for reconsideration in light of *Caden C.* (*Id.* at p. 863; see also *D.M.*, *supra*, 71 Cal.App.5th at p. 270 [juvenile court improperly equated "parental role" with attendance at medical appointments and understanding their medical needs].)

None of the issues identified in these cases which warranted remand are present here.  The juvenile court in this case discussed at length its finding that mother's relationship with Caden was not beneficial.  While in the cases cited by mother the juvenile courts' conclusions that there was no "parental bond" were either ambiguous or based on improper factors, here the juvenile court made clear that mother's bond with Caden was not "parental" because it was not nurturing and was disruptive to his permanence and stability.  As discussed above, substantial evidence supports the juvenile court's finding that mother's negative and destabilizing behaviors have been detrimental to Caden.  Finally, there is exhaustive evidence here from both the social worker reports and expert witnesses regarding the psychological importance of Caden's relationship with mother.

At bottom, the juvenile court was concerned that the focus on Caden's best interests had been lost somewhere during this extended and highly litigated case.  In rendering its decision, it acknowledged the court's own responsibility in making insufficient efforts towards permanency for the young minor.  It also observed: "[W]e are running . . . in circles, and in the center of that circle is [mother] and not Caden."  The court decidedly put the focus back where it belongs, on Caden.  As it eloquently explained to Caden: "[T]he reason I am doing this is not to be mean.  The reason I am doing this is

because I want you to grow.  I want you to learn.  I want you to live.  I want you to reach forward into life with curiosity and not back down from it from fear.  You need folks to help you to learn to do those things."  It explained further:  "[W]hy I am doing this is because you will then get yourself in a position to be Caden, to be Caden, and I look forward to seeing that Caden."  We look forward to that eventuality as well.

In *Caden C.*, the Supreme Court emphasized that the standard of review with respect to the beneficial relationship exception embodies "the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'"  (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)  Having concluded that the juvenile court made its determination in accordance with relevant law, we see no reason to disturb its thoughtful determination.[12]

### III.  DISPOSITION

The judgment is affirmed.

---

[12] Mother additionally argues that, given the juvenile court's legal error, we must reverse the juvenile court's termination of parental rights because it is reasonably probable that, but for that error, the juvenile court would not have rejected the beneficial relationship exception to adoption in this case.  Having concluded that no error occurred, we need not address mother's claim that the error was not harmless.

_____
Sanchez, J.

WE CONCUR:


_____
Margulies, Acting P. J.


_____
Banke, J.

A162420